IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


SANOFI, et al.,                 ) Trial Volume 3
                                )
          Plaintiffs,           )
                                ) C.A. No. 14-264-RGA
v.                              ) 14-265-RGA,
                                ) 14-292-RGA,
GLENMARK PHARMACEUTICALS,       ) 14-1434-RGA
INC., USA, et al.,              )
                                )
          Defendants.           )


                    Thursday, June 9, 2016
                    8:35 a.m.
                    Courtroom 6A


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS,
           United States District Court Judge




APPEARANCES:


          MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  DEREK J. FAHNESTOCK, ESQ.

             -and-

          FITZPATRICK, CELLA, HARPER & SCINTO
          BY:  WILLIAM E. SOLANDER, ESQ.
          BY:  DANIEL J. MINION, ESQ.
          BY:  JAMES TYMINSKI, ESQ.


               Counsel for the Plaintiffs

               Hawkins Reporting Service
      715 North King Street - Wilmington, Delaware 19801

APPEARANCES CONTINUED:



PROTOR HEYMAN ENERIO, LLP
BY:  DOMINICK T. GATTUSO, ESQ.

          -and-

ALSTON & BIRD, LLP
BY:  NATALIE C. CLAYTON, ESQ.
  BY:  CHRISTOPHER L. MCARDLE, ESQ.
BY:  WEN WU, ESQ.

          Counsel for the Defendant Watson



ABRAMS & BAYLISS, LLP
BY:  JOHN M. SEAMAN, ESQ.

           -and-

WINSTON & STRAWN, LLP
BY:  MAUREEN L. RURKA, ESQ.
BY:  JULIA M. JOHNSON, ESQ.
BY:  LOREN G. RENE, ESQ.

          Counsel for the Defendant Sandoz

```
1                    THE COURT:  Good morning,

2        everyone.  Please be seated.  Ms. Clayton, I

3        guess.

4                        MS. CLAYTON:  I think there's

5        still some housekeeping for Plaintiffs first.

6                        MR. SOLANDER:  Good morning, Your

7        Honor.

8                        THE COURT:  Good morning, Mr.

9        Solander.

10                       MR. SOLANDER:  So we left off last

11       time with the argument on Doctor Ardehali and

12        his testimony and I'd just like to make a brief

13       offer of proof, if I can.

14                       THE COURT:  All right.

15                       MR. SOLANDER:  We would offer --

16       if permitted, we would have offered the

17        testimony of Hossein Ardehali, MD, PhD, who is a

18         cardiologist at Northwestern University and we

19         would have offered him in support of the point

20        that the art was too unpredictable for a person

21       of ordinary skill in the art in 2008 to have

22       expected Dronedarone to reduce cardiovascular

23       hospitalizations without the benefit of the

24        results of the Athena study.  Your Honor, I put
```

1    a sticker on this.  I understand it's not

2     evidence.  It's PTX-555, just in case we need to

3    refer to it at some later point.

4                    THE COURT:  What is that?

5                    MR. SOLANDER:  You asked me to

6    submit the testimony in writing.  It's just a

7    highlighted transcript.

8                    THE COURT:  All right.  So

9     actually so I'll take that.  And so why don't we

10   do this, because when I was back after we

11    recessed yesterday, it occurred to me I was kind

12     of curious as to why nobody was citing much in

13   the way of authority.  So whenever you're

14     writing me these brief letters you're going to

15     be writing me about these other issues, if you

16    have anything that has any actual case authority

17     on the issue, you can supply that too.  And if

18   for some reason or other the case authority

19     tells me I was wrong in the ruling I gave last

20     night, then I will say so and actually read the

21     transcript and incorporate it into whatever it

22   is that I'm doing.

23                    MR. SOLANDER:  If Your Honor makes

24   that ruling, then we will have to submit both

1          sides.  I'm only offering the things we wanted

2      to get into evidence not the counters, of

3      course, but if Your Honor makes that ruling,

4          the counters will come in and we'll supply it.

5                          THE COURT:  Why don't you make

6      your offer.  I'll let Ms. Clayton at a later

7          time put in whatever counters she wants unless

8      she's ready to do that right now.

9                          MR. SOLANDER:  I think the better

10       way to do it is if we can attach the entirety of

11      it to this letter.

12                          THE COURT:  That will be fine too.

13                          MS. CLAYTON:  That's fine.

14                          MR. SOLANDER:  Okay.  So would you

15      like a copy of what it is right now?

16                          THE COURT:  No.  If you're going

17        to attach a copy, you know, that will count as

18      being --

19                          MR. SOLANDER:  Okay.  At the

20        moment I'm satisfied I've preserved it for the

21      record.

22                          THE COURT:  I think you have too.

23                          MR. SOLANDER:  Okay.  Oh, Your

24        Honor, we rest our rebuttal case on the issue of

1    validity.  Thank you.

2                    THE COURT:  Okay.  Thank you.  Ms.

3    Clayton.  Sorry.

4                    MS. CLAYTON:  This morning, Your

5    Honor, we're going to have a short deposition

6    clip.

7                    THE COURT:  Okay.

8                    MS. CLAYTON:  It's approximately

9     15 minutes.  12.  Even less.  Followed by Doctor

10   McDuff.

11                   THE COURT:  Okay.

12                   MS. CLAYTON:  And Mr. McArdle will

13   be introducing the deposition.

14                   THE COURT:  Okay.

15                   MR. McARDLE:  Good morning, Your

16    Honor.  Defendants are going to play portions of

17   the deposition of Mr. John Fritchman.  Mr.

18   Fritchman was deposed on July 29th, 2015, by

19   counsel for Defendants.  Mr. Fritchman is a

20    current Sanofi employee and is in charge of the

21    team that markets Multaq in the United States.

22    As Ms. Clayton indicated, the clip will run for

23    approximately 12 minutes with 10 minutes being

24   allocated to Defendants and two minutes to be

1     allocated to Plaintiffs.  I'm going to bring up

2     the highlighted portions and copies of the

3     exhibits for Your Honor.

4              THE COURT:  Okay.  That's good.

5     Thank you.

6              (Video playing.)

7              Q.  Good morning Doctor Fritchman.  Is

8     it Doctor or Mr.?

9              A.  Mr.

10             Q.  Okay.  Could you please state your

11     name for the record?

12             A.  John Fritchman.

13             Q.  Okay.  Could you state your

14     position currently?

15             A.  I am the brand lead for Multaq in

16     the United States for Sanofi.

17             Q.  Okay.  And what does that mean,

18     brand lead?

19             A.  I am the -- I'm in charge of the

20     marketing team that markets Multaq in the United

21     States.

22             Q.  Okay.  Let's start from the other

23     end.  After your high school education, can you

24     tell me about any college or graduate school

1        that you were involved with?

2                    A.   I attended -- for my bachelors

3        degree, I attended United States Military

4         Academy at West Point, and then I attended -- I

5        received an MBA from Regis University.

6                    Q.   What was your degree from West

7        Point in?

8                    A.   It was in mathematical science.

9                    Q.   Okay.  Did you obtain any

10       additional -- did you take any additional

11       courses after graduating from West Point or

12       Regis University that involve -- that have a

13       technical nature?

14                   A.   No.

15                   Q.   What does market shaping mean to

16       you?

17                   A.   It could mean a lot of things.  I

18        don't know what the context is in this document.

19                   Q.   What -- what are some of the

20       things that it could mean?

21                   A.   You could be -- it could be that

22        you are trying to establish, for example, rhythm

23        as an important component to treatment of afib.

24                   Q.   And what does that mean?

```
 1                   A.  So there are three components to

 2      treatment of afib:  There's anticoagulation,

 3       there's rate control and there's rhythm control.

 4      And it could mean that as a product that's an

 5       antiarrhythmic agent that's coming into a generic

 6        market, that they want to elevate the treatment

 7         of rhythm alongside of the other components of

 8      treatment of afib.

 9                   Q.  Would it be a promotion effort for

10      that use?

11                   A.  There will than some promotion,

12      yes.

13                   Q.  To elevate it over other generics

14      in the market?

15                   A.  Not necessarily.  It's more

16        important to elevate the treatment of rhythm in

17      general.

18                   Q.  Why?

19                   A.  Because as you saw in their

20      documents, you have anticoagulation, you have

21       rate and you have rhythm.  So those components,

22      physicians, they're going to have to make

23      decisions and -- clinical decisions as to how

24      they treat afib.  So if you're going to be --
```

```
1        again, it's important to have the rhythm

2        component for the patient as much as it is

3        anticoagulation or rate potentially.

4                Q.  Do you physicians and healthcare

5        providers review a label in consideration

6        whether to prescribe Multaq to patients?

7                A.  Yes.

8                Q.  Would it be fair to say that the

9        content of that label is the major driver for

10       prescribing Multaq?

11               A.  The label is the -- is the guide

12       by which they should prescribe a product.

13               Q.  Okay.

14               A.  Yes.

15               Q.  And you said is the guide by which

16        they should prescribe it.  Can they prescribe it

17       any other way?

18               A.  That's -- again, that's up to

19        the -- up to the physician.  Again, what we're

20       guided by is what we can promote.  So we can

21       promote basically only what's in the label.

22               Q.  Is the goal of marketing to

23       elevate the use of your product?

24               A.  Marketing is -- is to educate the
```

1      physicians and to ensure that -- I mean, again,

2      it's a myriad of things, but it's again, to

3       ensure that they understand how to appropriately

4      use Multaq for the appropriate patient for

5      atrial fibrillation.

6                    Q.  I'm going to hand you a document

7       that we're going to mark as Defendant's Exhibit

8      99.

9                    Do you have any reason to doubt

10     this is a Sanofi document?

11                   A.  No.

12                   Q.  If you turn to Page 7, below that,

13     that page is entitled, however, there is room

14     for a new AF treatment as physicians'

15     satisfaction with AF -- satisfaction with

16      current AF treatments is mediocre, 6 to 7 out of

17       10, whatever the treatment.  And there it breaks

18     down these drugs by rhythm and rate and

19     identifies the rhythm agents as amiodarone,

20     flecainide, sotalol, propafenone and the rate

21     agents as digoxin, carvedilol, diltiazem and

22     verapamil.  Do you see that?

23                   A.  Yes.

24                   Q.  Am I describing that correctly?

1         A.   Yes.

2         Q.   Okay.  If you could turn to page

3    9.  A little bit earlier we talked about a

4     similar discussion, but at the top of that page

5     9 it says the main source of Multaq business at

6    launch will be treatment switch, 86 percent.

7     And there it has a bar chart, it says initiation

8     4 percent, switch 86 percent, add-on 10 percent,

9    Rx type equals 100 percent.  So 4 percent

10   discusses initiation.

11             Is it fair to say that's

12   initiation of Multaq in patients who were not

13   being treated before?

14        A.   I'm not sure of the definition.

15        Q.   Okay.  If you look below that bar,

16   it says previous therapy all the way to the

17   right?

18        A.   Okay.

19        Q.   And then, if you look to the left

20    of that bar, it says previous therapy: None, and

21   then it says 4 percent.

22        A.   Okay.

23        Q.   So that means there's 4 percent of

24    the patient population that had no therapy.  If

```
 1      you look above that, it says initiation 4

 2       percent.  Is it fair to say initiation means the

 3      start of new therapy involving Multaq?

 4              A.  Yes.

 5              Q.  And then on the top bar, it says

 6       switch 86 percent.  And as we discussed earlier,

 7      is that -- is it fair to say that switch is

 8       switching from another antiarrhythmic agent to

 9      Multaq?

10              A.  No.

11              Q.  What does switch mean to you?

12              A.  Switch means -- could mean switch

13      from anything that they're being prescribed

14       potentially to Multaq.  It could mean a myriad

15       of things.  And I think the chart -- the chart

16       as it's described here shows a switch from rate

17       agent or it could be a combination thereof from

18      another rhythm.  So it doesn't -- it could

19      depend.

20              Q.  Fair enough.  So switch 86 could

21       be inclusive of the rate agent or a rate agent

22      and a rhythm agent; is that correct?

23              A.  Yes.

24              Q.  I'm going to give you a document
```

```
 1      that is -- we're going to mark as Defendant's

 2       Exhibit 100.  Do you have a reason to doubt this

 3      is a Sanofi document?

 4               A.  No.

 5               Q.  Is it fair to draw the conclusion

 6       that Multaq does not have a better efficacy than

 7      amiodarone from this Sanofi document?

 8               A.  No, I don't think it is fair to

 9      say.

10               Q.  Why not?

11               A.  Because you don't -- there's

12        multiple things that go into it.  I don't know

13      everything that's gone into this document.

14               Q.  I'm going to give you a document

15       we're going to mark as Defendant's Exhibit 111.

16      Okay.  You'll take a look at this.  I'm sure

17      you're very familiar with this.  This is the

18      Multaq Dronedarone label prescribing

19       information.  Am I accurate in my description?

20               A.  This was the label that was

21      revised in 2011.

22               Q.  Yeah.  I was just going to say

23       this is the August 2011 revised label.  But I'm

24       accurate, this is the prescribing information as
```

```
 1      of that date?

 2                A.  Yes.

 3                Q.  Okay.  And if you look at the

 4       indications and usage there on the first page,

 5        it includes the associated cardiovascular risk

 6      factors, doesn't it?

 7                A.  Yes, it does.

 8                Q.  And then if you flip the page to

 9      page 2, you'll see it says full prescribing

10       information at the top and then, under number 1,

11      it also mirrors the same associated

12      cardiovascular risk factors; is that correct?

13                A.  Yes.

14                Q.  Okay.  You can set that aside.

15        I'm going to give you a document we're going to

16      mark as Defendants Exhibit 112.

17                    Now, you'll notice this is also

18        Multaq prescribing information.  In the bottom

19      right-hand corner, it says revised December

20      2011.  This is while you were in charge of

21      Multaq.  So this was during your -- your

22      involvement with Multaq; is that accurate?

23                A.  No, this isn't when I was in

24        charge.  This is when I was a product manager on
```

1    Multaq.

2              Q.  All right.  Mr. Fritchman, is it

3    accurate to say that there are a number of

4     antiarrhythmic drugs on the market, both in the

5    rhythm class and the rate class?

6              A.  There are -- there are many --

7    there are various products that are used to

8    treat atrial fibrillation.  There are several

9    antiarrhythmic agents and then there are

10    obviously several rate agents that are used in

11   the treatment of afib, yes.

12             Q.  So there were -- I guess it's

13    accurate to say, also, there was no absence of

14   products to treat atrial fibrillation?

15             A.  I don't understand the question

16   about when you -- how you refer to it as an

17   absence of products.

18             Q.  Was there any long-felt need that

19    Multaq had to be on the market or was there --

20   are -- or were there already products used to

21   treat atrial fibrillation?

22             A.  There was a significant unmet need

23   in the marketplace in the treatment of atrial

24   fibrillation.

```
1                Q.  And what was that?

2                A.  There were many.  The

3    consideration for treatment for afib is that

4    the -- the class of drugs utilized have some

5    significant side effects associated,

6    particularly in the rhythm component.

7                (Video complete.)

8                MR. McARDLE:  Your Honor, just a

9    few housekeeping matters.  We want to move in

10     JTX-80, JTX-81 and JTX-92 from Mr. Fritchman's

11   deposition testimony.

12                MR. ROTHMAN:  No objection.

13                THE COURT:  All right.  Those

14   three are admitted without objection.

15                MR. McARDLE:  And then we have a

16    few other -- a few other exhibits we're going to

17     be moving in as well.  There's DTX-78, which is

18   your claim construction opinion.

19                THE COURT:  You don't need to move

20   the claim construction opinion into evidence.

21                MR. McARDLE:  Well, we want it on

22   the record for appeal, Your Honor.

23                THE COURT:  It's on the record.

24                MR. McARDLE:  Okay.  The
```

1          transcript, is that -- do we need to move that

2     in?

3                    THE COURT:  The transcript of

4     what?

5                    MR. McARDLE:  Of the claim

6     construction hearing, Your Honor.

7                    THE COURT:  No.

8                    MR. McARDLE:  Okay.  Well, you can

9      tell me if I'm mistaken in the next few as well.

10      Portions of the '167 Patent file history, just

11     specifically the application and reasons for

12      allowance.  That's DTX-331.  DTX-332 is exhibits

13     or sorry excerpts from the joint claim

14     construction chart, specifically.

15                    THE COURT:  The Markman issues are

16     preserved without doing anything at trial.

17                    MR. McARDLE:  Okay.  Okay.  Your

18     Honor.  Thank you, Your Honor.

19                    THE COURT:  Okay.  Thank you, Mr.

20     McArdle.

21                    MR. SOLANDER:  Your Honor, with

22      respect to the patent file history of the patent

23       that's in this case, which I understand he was

24     just offering, I suppose that can come in, I

3526

```
 1    don't see a problem with that --

 2                  THE COURT:  Well, but, you know,

 3    it drives me crazy people just admitting

 4    documents that have no apparent connection to

 5    anything that's actually a trial issue.

 6                  MR. SOLANDER:  I'm not offering

 7     it.  I'm not offering it.  I was just saying I

 8    don't want excerpts, I want the whole thing.

 9                  MS. CLAYTON:  Your Honor, there is

10     one document that is on that list that was not

11    part of the claim construction.

12                  THE COURT:  Okay.

13                  MS. CLAYTON:  And that is the

14    DTX-331, the excerpts of the '167 Patent file

15    history.

16                  THE COURT:  What is the relevance

17    to the trial we're having?

18                  MS. CLAYTON:  The relevance to the

19    trial is to show the original scope of the

20     claims that Plaintiffs or the patentee requested

21      with the patent office, and then the ones they

22    eventually obtained that were much narrower.

23                  THE COURT:  Did some witness refer

24    to this?
```

```
 1                    MS. CLAYTON:  I mean, it was
 2          referred to during Doctor Radzik's deposition,
 3           the professionals, and then during the opening,
 4      I know we saw the original scope and then
 5      obviously we've seen the currently narrowed
 6      claims quite frequently from -- I mean, the
 7      narrow claims that ultimate issues were
 8      discussed by almost every witness.
 9                    THE COURT:  And this proves what?
10                    MS. CLAYTON:  It's just to show
11      that originally they had requested a much
12      broader invention and then they narrowed that
13      invention during prosecution.
14                    THE COURT:  That proves what?
15                    MS. CLAYTON:  Well, a couple of
16       things, Your Honor.  First, there is an argument
17        here that they are not entitled to the original
18         priority date, which Doctor Radzik was talking
19      about.
20                    THE COURT:  Okay.  That's good.
21      I'll let it in for that.
22                    MR. SOLANDER:  Your Honor, I don't
23       know that those excerpts go to that at all.  She
24      was talking about an office action in the
```

```
 1    allowance.

 2              THE COURT:  Well, that would be --

 3    so, you know, I'm probably happy to have the

 4    entire file history admitted into evidence.

 5              MS. CLAYTON:  We don't object to

 6     that.  We were just trying to focus on what we

 7    needed.

 8              THE COURT:  Here's what we're

 9     going to do.  I'm more and more appreciating the

10    stuff that Judge Robinson does.  When we have

11     the briefing after this, if you don't mention in

12    the briefing all these exhibits we're

13      introducing, I'm going to strike them from the

14      record.  I mean, because it's just -- because I

15     do think that a lot -- I had my doubts as to how

16     many of these things are actually being admitted

17      for anything other than they were mentioned, so

18    let's admit it.  It's not a rule that if you

19    mention an exhibit you have to admit it into

20    evidence.  But anyway, prosecution history

21      sounds plausible to me.  There's no objection.

22     It's admitted.  You're going to give me DTX-331?

23              MR. SOLANDER:  That's not the

24      entirety of the prosecution history, that's my
```

```
 1        point.  We can figure out that number and tell

 2     Your Honor.  It's not a problem.

 3                  THE COURT:  Okay.  All right.  Are

 4     we up to Doctor McDuff?

 5                  MS. CLAYTON:  Yes.  At this time

 6     Defendants call Doctor McDuff to the stand.

 7                  Your Honor, may we approach the

 8     Court.

 9                            ROBERT DeFOREST McDUFF,

10                  the deponent herein, having first

11                  been duly sworn on oath, was

12                  examined and testified as follows: BY

13     MS. CLAYTON:

14                  Q.  Good morning, Doctor McDuff.

15                  A.  Good morning.

16                  Q.  Would you please state your name

17     for the record?

18                  A.  DeForest McDuff.

19                  Q.  And very briefly, what were you

20     asked to testify about here today?

21                  A.  I was asked to testify about the

22     alleged commercial success of Multaq.

23                  Q.  And have you prepared slides today

24     to assist with that testimony?
```

1                 A.  I have.

2                 Q.  And have you prepared a slide that

3     briefly summarizes your educational and work

4     history?

5                 A.  Yes, that's the next slide.

6                 Q.  Could you briefly, using this

7      slide, describe for us your educational and work

8     history?

9                 A.  Yes, I have bachelors degree in

10     mathematics and economics from the University of

11      Maryland.  I have a masters degree and a PhD in

12       economics from Princeton University.  I work as

13     an economic consultant at a company called

14      Intensity.  I'm a vice president there and head

15       of the Boston office.  I have more than 10 years

16     of experience in consulting, finance and

17     economic research.

18                 Q.  And has your work involved being

19     an expert in pharmaceutical litigation cases?

20                 A.  Yes, I worked on more than 30

21     cases.

22                 Q.  And have you dealt with issues

23      related to commercial success in pharmaceutical

24     litigations?

```
1                    A.  Yes, in more than 20 cases.

2                    Q.  And if you look at JTX-234, which

3        is in your binder.

4                    A.  Okay.

5                    Q.  Is this your CV?

6                    A.  Yes, it is.

7                    Q.  Is it current and accurate?

8                    A.  Yes, as of January 2016.

9                    MS. CLAYTON:  And Your Honor, we

10        would tender Doctor McDuff as an expert witness

11        in economic analysis as it pertains to

12        commercial success.

13                    MR. ROTHMAN:  No objection.

14                    THE COURT:  You may proceed.

15        BY MS. CLAYTON:

16                    Q.  What were you asked to do in this

17        case, Doctor McDuff?

18                    A.  I was asked to evaluate the

19        alleged commercial success of Multaq.  I was

20        also asked to review the reports submitted by

21         Mr. Tate and Doctor Reiffel as they pertain to

22        commercial success.

23                    Q.  And what is your understanding of

24        commercial success?
```

```
 1              A.  Commercial success is one of the

 2      secondary considerations that's used in the

 3       evaluation of obviousness or can be used.  The

 4      idea is that if a product is commercially

 5      successful and it were obvious it would have

 6      been brought to market sooner in response to

 7      market forces.

 8              Q.  How did you develop that

 9      understanding?

10              A.  That's based on my experience as

11      an economist working on a number of cases of

12       this type and discussions and review of case law

13      over the years.

14              Q.  And have you reached conclusions

15       related to the commercial success of Multaq in

16      this case?

17              A.  I have.

18              Q.  And have you prepared a slide that

19      summarizes those opinions?

20              A.  Yes.

21              Q.  If you could go to the next slide.

22       So using this slide, can you briefly summarize

23      for the Court what your opinion is related to

24      Multaq and its commercial success are?
```

```
1                    A.   Yes, number 1, Multaq has not been

2       a commercial success.   Number 2, there were

3       disincentives for development in the form of

4        blocking patents and exclusivity that weaken the

5         economic relevance of commercial success here.

6        And number 3, Plaintiffs have not demonstrated a

7       nexus to the patents in suit.

8                    Q.   And how did you go about

9       developing these opinions for this case?

10                   A.   I approached this case the same

11      way as all my cases.   I analyze sales data,

12      profit data, market analysis, internal Sanofi

13       documents, deposition testimony, things of that

14      nature.

15                   Q.   And are there some primary factors

16       that led you to your conclusions in this case?

17                   A.   Yes, you can see that on the next

18      slide.

19                   Q.   And can you just briefly describe

20      for us what each of these points is?

21                   A.   Yes.   Number 1, Multaq sales are

22       low.   Number 2, Multaq has a low market share in

23      a variety of market definitions.   Number 3,

24       Multaq has future limited opportunity.   In other
```

```
 1          words, sales are unlikely to grow significantly
 2           from here.  Number 4, Multaq has not earned an
 3           economic profit and is unlikely to ever earn an
 4           economic profit.  Number 5, blocking patents and
 5          exclusivity limit the economic relevance of
 6          commercial success here.  And number 6,
 7           Plaintiffs have not demonstrated a nexus between
 8            the '167 Patent and sales in the use of Multaq.
 9                  Q.  So let's go through these in order
10          and let's start with the low sales.  Now, did
11          you evaluate the Multaq sales in this case?
12                  A.  I did.
13                  Q.  And have you created a
14          demonstrative that shows those sales through
15          launch?
16                  A.  Yes.
17                  Q.  If we could look at slide 6 from
18           your demonstratives, what is this slide showing
19          us?
20                  A.  This slide shows worldwide Multaq
21           sales from 2009 to 2015.  As you can see, they
22          grew to around $350 million.
23                  Q.  And what is the -- from 2011 and
24          2015, what are we seeing there for the market
```

1      sales for Multaq?

2                 A.  Well, they grew in early years but

3      since 2011 they have been relatively flat and

4      controlling for inflation they're actually

5      declining in recent years.

6                 Q.  And in particular, what are we

7      seeing between the years of 2014 and 2015?

8                 A.  Well, that's the decline that I

9       was talking about.  You can see the decline here

10     in nominal terms.  Controlling for inflation

11     it's even greater.

12                Q.  And what are the level of sales to

13     date tell you about Multaq?

14                A.  Well, $350 million isn't that

15     significant, not in the pharmaceuticals

16     industry.  And we've got some -- I'll discuss

17     that more on the next slide.

18                Q.  Now, what underlying data did you

19     rely on in creating this slide?

20                A.  These sales come from the Sanofi

21     public filings to investors, they are 20F's.

22                Q.  Okay.  And if you could quickly

23     look at DTX-3, DTX-211, DTX-330A, JTX-148A,

24      JTX-149B, JTX-150B, JTX-151B and JTX-152B.  Is

```
1          that the information related to the calculation

2           you performed here and the underlying data you

3      relied on?

4               A.  Yes.

5               MS. CLAYTON:  And Your Honor, we

6       would offer into evidence -- some of these have

7      already been moved in, but we would offer

8       DTX-211, which has not been moved in.  DTX-330A,

9      JTX-149B, JTX-150B, JTX-151B and JTX-152B.

10               MR. ROTHMAN:  No objection.

11               THE COURT:  All right.  Admitted

12      without objection.

13      BY MS. CLAYTON:

14               Q.  Are you familiar with the term

15      blockbuster drug?

16               A.  I am.

17               Q.  And what does that term mean?

18               A.  It's a term that's used in the

19      industry that refers to a drug that has more

20      than a billion dollars in sales in a calendar

21      year.

22               Q.  And is Multaq a blockbuster drug?

23               A.  It's not.

24               Q.  And what is the relevance of
```

```
 1          comparing Multaq to a blockbuster drug?

 2                    A.  Well, the relevance or the purpose

 3           is to try to get some benchmarks for evaluating

 4            whether Multaq is a success.  It's not required

 5          that a drug be a blockbuster in order to be a

 6          commercial success, but it is one benchmark

 7          that's used in the industry to describe a

 8          successful or a profitable product.

 9                    Q.  And did you also compare the

10          Multaq sales to other benchmarks in the

11          industry?

12                    A.  Yes, I did.

13                    Q.  And have you also created a

14          demonstrative to illustrate this?

15                    A.  Yes, that's the next slide.

16                    Q.  If we can take a look at slide 7.

17           Can you describe for us what you're showing on

18          this chart?

19                    A.  Yes, this slide shows Multaq sales

20           in the context of the broader industry.  So this

21          is from peer-reviewed published economic

22           literature on returns to pharmaceutical research

23           and development.  And there are four lines here.

24          The first is 1st Decile drugs, the second is 2nd
```

```
 1        Decile, the third is mean or average drug sales

 2        and the 4th in red is Multaq at the bottom.

 3                Q.  And when you say 1st Decile, what

 4        does that mean?

 5                A.  That refers to drugs that are in

 6         the top 10 percent, so from the 90th percentile

 7        to the 99th percentile.

 8                Q.  And 2nd Decile?

 9                A.  Those are in the second 10

10         percent, so from the 80th percentile to the 89th

11        percentile.

12                Q.  Okay.  How does Multaq compare to

13        those in the mean?

14                A.  Multaq is significantly less than

15        1st Decile drugs.  As you can see, 1st Decile

16        drugs exceed a billion dollars a year by the

17        fourth year on the market and grow to roughly

18         $2.5 billion per year.  2nd Decile drugs grow to

19        about 8- or $900 million at their peak level.

20        Both of these types of drugs are really the

21        industry drivers of profitability.  It's only

22        the top three deciles of drugs that actually

23         turn an economic profit on average.  Multaq lies

24        below the average drug or the mean drug.  And
```

```
 1        this is important because it's known in the
 2         literature that average drugs tend to be about
 3         break even from economic perspective.  In other
 4         words, the profits just about compensate for the
 5         cost of commercialization, but not more.  So the
 6         fact that Multaq is below the average indicates
 7        that it's unlikely to become economically
 8        profitable.
 9                Q.  Now, it looks like you obtained
10        the chart at the first, second and mean lines
11        from an article; is that right?
12                A.  Yes.
13                Q.  And if you turn to JTX-241, is
14        that the article where you obtained that
15        information from?
16                A.  It is, yes.
17                MS. CLAYTON:  And Your Honor, we'd
18        offer JTX-241 in evidence.
19                MR. ROTHMAN:  No objection.
20                THE COURT:  All right.  Admitted
21         without objection.
22        BY MS. CLAYTON:
23                Q.  And the mean for Multaq or the
24        line for Multaq, where did you get that
```

```
 1    information?

 2              A.  That information comes from the

 3    Sanofi 20F's from the previous slide and they

 4     have been adjusted for inflation to put them on

 5    an apples to apples basis relative to these

 6    lines from the literature.

 7              Q.  Now, based on the chart and this

 8     data here, does Multaq appear to be a commercial

 9    success in your opinion?

10              A.  No.

11              Q.  And why not?

12              A.  Well, as indicated, Multaq sales

13    just aren't that significant, not in the

14    pharmaceuticals industry.  And in particular,

15    lying well below other profitable drugs and

16    lying below even break even drugs in terms of

17     the average.  It's unlikely to turn an economic

18    profit.

19              Q.  All right.  Now, let's move onto

20    the second topic that you had in your slides,

21    low market share.  And what is market share?

22              A.  Market share is a measure of use

23     of a particular product divided by the total use

24    in the market.
```

```
 1                  Q.  And why are market shares relevant

 2       for commercial success?

 3                  A.  They're relevant because they

 4        provide another comparison or another benchmark

 5       to competitive drugs or drugs in the same

 6       market.

 7                  Q.  And are there two different ways

 8       to analyze market share via revenue and via

 9       prescriptions for pharmaceuticals?

10                  A.  There are, those are both used in

11       the pharmaceuticals market.

12                  Q.  And were you here for Mr. Tate's

13       testimony yesterday?

14                  A.  I was.

15                  Q.  And as part of that, did he do an

16       analysis of market share in his testimony?

17                  A.  Yes.

18                  Q.  And did he do a market share for

19       both revenues and for total prescriptions?

20                  A.  Yes, he did.

21                  Q.  And do you agree with Mr. Tate's

22       conclusions on the market share?

23                  A.  No.

24                  Q.  Have you prepared a slide that
```

```
 1        demonstrates or describes your disagreement with

 2        Mr. Tate?

 3                  A.  Yes, that's the next slide.

 4                  Q.  And so can you briefly tell us the

 5         high level of your disagreement and then I will

 6        go through those one by one?

 7                  A.  Sure.  This chart shows some of

 8         the points put forward by Mr. Tate and some of

 9         my responses to those points.  Number one, Mr.

10        Tate focuses on revenue share and those are

11        flawed in the highly generic market where the

12         prices are very different.  Number two examines

13         competition with AAD's only, yet evidence in the

14         case that Multaq competes with a broader set of

15         AF drugs.  And number three, even if you accept

16        his market definition, I don't find an 11

17         percent market share to be a strong indicator of

18        commercial success.

19                  Q.  Okay.  So let's start with Mr.

20         Tate's focus on revenue share.  And Ted, can we

21         bring up Tate slide 10 from yesterday?  And this

22         is the chart that Mr. Tate used to discuss the

23        revenue shares; is that right?

24                  A.  Yes.
```

1          Q.  In your opinion, is Mr. Tate's

2       chart a fair representation of Multaq's market

3    share?

4          A.  No, it's not.

5          Q.  Why not?

6          A.  Well, because as Mr. Tate

7    testified yesterday, there's only two branded

8    drugs out of six AAD's on the market.  And so

9       because Multaq has a significantly higher price

10      due to patent protection from the generics, all

11    this market share tells you is that Multaq is

12    one of the few branded drugs with patent

13    protection on the market.  It's just not that

14    informative of Multaq's relative use.

15          Q.  So is it fair to say that Multaq's

16     higher price is the reason that it enjoys higher

17    market share in the revenues market share?

18          A.  Yes, that's right.

19          Q.  You also mentioned price.

20     Yesterday Doctor Tate testified that the premium

21    price Multaq enjoys is evidence of Multaq's

22    commercial success.  Do you recall that

23    testimony?

24          A.  I do.

1              Q.   Do you agree with that?

2              A.   No.

3              Q.   Why not?

4              A.   Because this is going to be true

5    in every single situation where you have a

6     branded drug that has patent protection compared

7      to prices of generics.  They're higher because

8     they have patent protection and drugs without or

9    with generic equivalents do not, so that's

10   really the driver.  Doesn't tell us that much

11   about commercial success.

12             Q.   All right.  Now, let's move on to

13   the next criticism you had with Mr. Tate's

14   market share analysis and that's mainly the

15    market that he relies on.  So again, how did Mr.

16   Tate define the relevant market for Multaq?

17             A.   He defined the relevant market

18   based on antiarrhythmic drugs only.

19             Q.   And do you believe that's the

20    appropriate description of the market in which

21   Multaq competes?

22             A.   No.  In my opinion that's too

23   narrow.

24             Q.   And why do you say that?

1          A.  Because evidence indicates

2      competition and substitution over a broader

3      range of drugs, not just the AAD's.

4          Q.  And so with what other types of

5      drugs do you believe that Multaq competes with?

6          A.  It also competes with rhythm

7      control -- it competes with rhythm control

8       drugs, of course, also with rate control drugs

9      and to some extent anticoagulants as well.

10          Q.  And what do you base that

11     conclusion on?

12          A.  That's based on my review of the

13      evidence, particularly Sanofi internal documents

14     and third-party market research.

15          Q.  All right.  Let's look at some of

16     those documents.  Ted, can we see JTX-242?

17     Doctor McDuff, what is this document?

18          A.  This is a Multaq launch plan

19     created by Sanofi prior to launch in January

20     2006.

21          Q.  And if we could look at the last

22      section on that first page, it says market size.

23     What is Sanofi saying here?

24          A.  Here they're evaluating the

5718

 1         commercial opportunity for Multaq.  And they're

 2         examining the AF market.  That's the atrial

 3          fibrillation market.  They have evaluation for

 4          that market that they are trying to obtain.  You

 5         can see in the second sentence here the

 6          antiarrhythmic class of agents is reported as a

 7         smaller segment, so in other words Sanofi is

 8         thinking about the AF market broadly and they

 9         think of the AAD's as a class or a segment of

10         that market.

11                   Q.  If we could look at DTX-12 now.

12         And what is this document?

13                   A.  This is an e-mail.  And if you go

14          to page 4 of this document you'll see the plan

15          itself.  This is a Multaq marketing plan.  This

16         was completed by Sanofi after product launch.

17                   Q.  And from your review of the

18         document, that was my question, approximately

19         what year was this created in?

20                   A.  Around 2010.

21                   Q.  And I think you said that was

22          after Multaq was launched in the market; is that

23         right?

24                   A.  Yes.

```
1                  Q.  If we could look at page 10 of

2       this document, ends in bates number 1135.  So

3       what is this chart telling us right here?

4                  A.  This chart is an analysis of

5        Multaq use and where Multaq business is coming

6       from, so it shows a variety of sources or

7       originations.  Number one switches from other

8        AAD's.  Number two, there's some switching from

9         rate control treatment.  Number three, there's

10       adding to rate control and adding to Warfarin or

11      anticoagulants, so you can see that there's

12      competition in Multaq's use and business

13       actually comes from a wide range of sources, not

14      just other AAD's.

15                 Q.  Okay.  Now, let's look at one of

16        the other documents you mentioned DTX-205.  And

17      what is this document?

18                 A.  This document is a Medgadget

19        research report.  They're a third-party market

20      research firm.

21                 Q.  What is this report relating to?

22                 A.  It relates to the atrial

23      fibrillation market.

24                 Q.  And if we could look at page 3 of
```

```
 1          this document.  The second full paragraph where

 2           it says all sectors, call that out.  And what is

 3          Medgadget saying about the AF market here?

 4                    A.  Well, here they are confirming

 5          what we see internally at Sanofi, so they are

 6           referring to all sectors of the AF market have

 7           been historically saturated with generics.  And

 8          this confirms the notion that there's a

 9           commercial opportunity in the broader AF market

10           and there are segments that people think about,

11           obviously the rate control, the rhythm control

12          and anticoagulants.

13                    Q.  So taking the documents we see

14          together, what does this tell you about the

15          Multaq, in which market it competes?

16                    A.  It indicates a broader notion of

17           competition and market opportunity than just the

18          AAD's.

19                    Q.  In addition to these documents

20          have you heard any testimony in the course of

21           this trial that further confirms that for you?

22                    A.  Yes.  This is also consistent with

23                    the deposition testimony of Mr.

24          Fritchman that
```

1                    we heard this morning, as well as

2        testimony from

3        Doctor Zusman.

4                    Q.  All right.

5                    MS. CLAYTON:  And Your Honor, for

6        the record, Defendants would offer JTX-242,

7        DTX-12 and DTX-205.

8                    MR. ROTHMAN:  No objection.

9                    THE COURT:  All right.  They are

10       admitted without objection.

11       BY MS. CLAYTON:

12                   Q.  Did you prepare a slide

13       demonstrating your calculation of the market

14        share based on prescriptions, using the various

15       markets that we've just discussed?

16                   A.  Yes, I did.

17                   Q.  And if we could turn to the next

18       slide, which is slide 10.

19                   MR. ROTHMAN:  Your Honor, we have

20       an objection to an exhibit that's nested

21        throughout this demonstrative.  You can see this

22        demonstrative refers to attachments B13 and B14,

23       which are DTX-290 and 291.  Those refer to an

24       exhibit DTX-294A, 295A that we believe is

1    objectionable.

2                    THE COURT:  And it's objectionable

3    because?

4                    MR. ROTHMAN:  Because the

5     witness -- the document itself is a collection

6      of IMS data.  The document wasn't produced to us

7    in fact discovery, so we didn't have the

8      opportunity during fact discovery to figure out

9    what the actual IMS data was.  When we were

10     presented with the IMS date in his expert report

11   and we asked him what that collection was, he

12   did not know.  He said he received that

13   information from counsel -- counsel or the

14     client.  He was not sure which had procured it

15   from IMS, he wasn't familiar with what the

16   communication was made from counsel or the

17     client to obtain that information.  And when I

18    asked him why there were certain products on the

19   list and not on the list, he was not able to

20   tell me, because he did not know what request

21    was made that arrived at the document.  Lack of

22   foundation.

23                    THE COURT:  So that's your

24   objection, lack of foundation?

```
 1                    MR. ROTHMAN:  Right.

 2                    THE COURT:  All right.  Why don't

 3      you ask some questions about that.

 4                    MS. CLAYTON:  I can establish the

 5      foundation of those documents, Your Honor.  I

 6      would just like to say I think that was an

 7      incorrect characterization of Doctor McDuff's

 8      testimony in his deposition.

 9                    May I approach the witness with

10      these two documents, Your Honor?

11                    THE COURT:  Yeah.  So what he said

12       in his deposition doesn't really matter.  What

13      he says right now is what matters, okay?

14                    MS. CLAYTON:  Okay.

15

16      BY MS. CLAYTON:

17                    Q.  Doctor McDuff, you've been handed

18       two documents which are DTX-294 and 295.  What

19      are those documents?

20                    A.  These are attachments C2 and C3 to

21      my expert report.  They provide the raw

22       underlying IMS health data that I used for the

23      calculation of the market shares on the slide

24      that's up on the screen.
```

1          Q.  And how did you go about obtaining

2     this IMS data?

3          A.  In order to obtain the IMS health

4     data I had to request of counsel to get a

5      broader set of IMS health data.  The IMS health

6       data that was provided by Mr. Tate was limited

7     to AAD's only and the evidence I reviewed

8     indicated a broader market definition, so I

9     needed more data in order to make that market

10      share calculation.  So I requested data from IMS

11     Health on the National Prescriptions Audit.

12      That's related to attachment C2 and the National

13     Disease and Therapeutic Index, the NDTI data.

14     That's on attachment C3.  I requested

15      information on drugs that were used for atrial

16     fibrillation.

17          Q.  And you referred to C2 and C3.

18      Which trial exhibit numbers do those documents

19     have on the front?

20          A.  DTX-294, that's for attachment C2.

21     And DTX-295, that's for attachment C3.

22          Q.  And what exactly -- what type of

23      IMS data did you request from counsel in terms

24      of the actual drug markets you were looking for?

```
 1                    A.  I requested information from the

 2                       National Prescriptions Audit because I

 3    wanted to

 4     perform a prescription share.  In addition, I

 5      requested information from the National Disease

 6      and Therapeutic Index.  That provides diagnosis

 7     codes, so it allows you to factor the market

 8     shares for atrial fibrillation use only.  In

 9      other words, these market shares or limited to

10     just use for atrial fibrillation.  Where an

11     anticoagulant, for example, that has a lot of

12     non-atrial fibrillation use, the NDTI data

13     allows you to factor that out in the

14     calculation.

15                    Q.  And what is your understanding of

16     how counsel obtained the IMS data for you?

17                    A.  My understanding is that they

18     obtained it from one of the Defendants in the

19     case.

20                    Q.  And is it your understanding that

21     pharmaceutical companies commonly have

22     subscriptions to this type of data?

23                    A.  Yes, it's very common.

24                    Q.  So once you received the data, did
```

```
1       you review it?

2                   A.  Yes.

3                   Q.  Do you frequently receive this

4       type of IMS data in other cases?

5                   A.  Yes, all the time.

6                   Q.  How often do you think you review

7       IMS data?

8                   A.  I've used it in at least 15 cases.

9                   Q.  Okay.  And so when you reviewed

10      the data, did the data comport with previous

11      data that you had seen from IMS?

12                  A.  Yes, absolutely.

13                  Q.  Did it appear to be the data that

14      you had requested from IMS?

15                  A.  Yes.

16                  Q.  In your opinion, is there -- is it

17      the data that you had requested?

18                  A.  Yes.

19                  MS. CLAYTON:  Your Honor, we would

20      offer these two exhibits into evidence.

21                  THE COURT:  All right.  I'll allow

22      it on that basis and you, Mr. Rothman, can

23      address it on cross-examination.

24                  MR. ROTHMAN:  Great.  Thank you,
```

1      Your Honor.

2   BY MS. CLAYTON:

3            Q.  So if we could bring back up slide

4    10.  And it's already up there.  We had started

5    to discuss the relevant markets that you have

6     outlined here.  What is the first one you have

7    here that says atrial fibrillation?

8            A.  This includes all atrial

9     fibrillation use of rate control drugs, rhythm

10   control drugs and anticoagulants.

11           Q.  And why did you list that as a

12   relevant market?

13           A.  Well, this is relevant because of

14    the broader nature of competition.  They are all

15   trying to treat atrial fibrillation.  There's

16    different methods to do so, but they all end up

17    with the same objective or the same end result.

18           Q.  Okay.  And if we use the broader

19   atrial fibrillation market, what was Multaq's

20   peak share in 2015?

21           A.  It's peak share as of several

22    years ago, around 2011, was 2.4 percent and as

23   of last year it has declined to 1.4 percent.

24           Q.  And for the atrial fibrillation

```
 1          market, which data between DTX-294 and 295 did

 2     you rely on?

 3               A.  It's a combination of both.  It's

 4      based on the number of prescriptions having been

 5     factored for atrial fibrillation use only.

 6               Q.  Okay.

 7               THE COURT:  So Doctor McDuff, if

 8     somebody happens to prescribe Warfarin and it

 9     was described as being because they of atrial

10       fibrillation, that would be part of the market

11     that you would say Multaq was -- that you get

12     this 2 or 1 percent from?

13               THE WITNESS:  Yes, correct.  If it

14     were prescribed for something else that had a

15      different diagnosis code, it would not be in

16      this calculation.

17     BY MS. CLAYTON:

18               Q.  And if we look at this second row

19       here, the rate control and rhythm control, what

20     market does that include?

21               A.  That's limited to just the rate

22      control drugs and just the rhythm control drugs.

23               Q.  And why did you also list this

24     here?
```

```
1                    A.   Because I think there's at least

2          competition with the rate control drugs.  And so

3      in this relevant market, it relates to just

4      treatment of those two classes.

5                    Q.   Okay.  And what was Multaq's peak

6      share in this market in their 2015 share?

7                    A.   The peak share was 4.3 percent and

8      its declined to 2.7 percent as of last year.

9                    Q.   And again, what data did you use

10     to reach these percentages?

11                   A.   These are the same IMS health data

12     we've been discussing, DTX-294 and DTX-295.

13                   Q.   Okay.  And finally, the third row

14     you have rhythm control only (Tate Report).

15     What market is that?

16                   A.   This is limited to the AAD's only

17     as presented by Mr. Tate.

18                   Q.   And the peak share of 10.8 and the

19      2015 share of 7.1 percent, are those the figures

20     that Mr. Tate offered yesterday?

21                   A.   Yes.

22                   Q.   And I just want to make sure this

23     is clear.  The top of the slide says total

24      prescriptions.  So what market share calculation
```

5858

```
1      are we focused on in this slide?

2                   A.  This is the prescription share.

3                   Q.  As opposed to the revenue share;

4      is that right?

5                   A.  Correct.

6                   THE COURT:  I'm sorry, Ms.

7      Clayton.  Is this the U.S. market or the

8      worldwide market.

9                   THE WITNESS:  This is U.S.  IMS

10     data only is for the U.S.

11     BY MS. CLAYTON:

12                  Q.  So in your opinion, do any of

13     these market shares demonstrate commercial

14     success?

15                  A.  No, not in my view.

16                  Q.  And why is that?

17                  A.  These aren't the kind of market

18     shares that represent a new product coming on

19     the market and capturing the commercial

20     opportunity of that market.  Even with the

21      rhythm control only at 11 percent peak share is

22      not that high.  It's declined to only 7 percent

23     in recent years.  And with the broader market

24      definitions, we have a market share in the low
```

```
1      single digits.

2                   Q.  Now, let's move on to the next

3       topic, which is limited future opportunity.  And

4      what do you mean by that?

5                   A.  Here I'm referring to Multaq's

6       potential to grow in the future, whether it can,

7      you know, achieve significantly more sales in

8      the future than it has today.

9                   Q.  And what information did you

10     review in determining Multaq's future

11     opportunity?

12                  A.  I reviewed evaluations from third

13     parties studying the market.  I reviewed

14     information from the FDA.

15                  Q.  All right.  And based on your

16     review, do you believe Multaq has a strong

17      opportunity to make higher sales in the future?

18                  A.  No.

19                  Q.  A why not?

20                  A.  We can see one example here on the

21     next slide.

22                  Q.  Actually I think it's -- could you

23     bring up DTX-184, Ted.  And what is this

24     document?
```

1              A.  This document is an FDA safety

2      announcement related to the risk of death and

3      serious cardiovascular adverse events.

4              Q.  And if we could look at the first

5      full paragraph in your safety announcement.

6      What is that saying?

7              A.  This is saying that FDA has

8       completed a safety review of Multaq and it has

9      shown significant risk including death and

10     serious cardiovascular events.  And this is a

11      warning that the FDA issues for prescribers of

12     Multaq.

13             Q.  And whether when was this issued?

14     What's the date?

15             A.  In 2011.

16             Q.  And how does this influence your

17     opinion on Multaq's future opportunity?

18             A.  This is the kind of safety warning

19      that you expect to limit growth of future sales

20     going forward.

21             Q.  If we could look at another

22     document, DTX-195.  What is this document?

23             A.  This is a document from a

24      third-party market research firm relating to the

1    top ten drug launch disasters.

2                   Q.  Okay.  And if we could turn to the

3    second page, do you see Multaq about half way

4    down that list?

5                   A.  Yes, I do.

6                   Q.  So what is this article saying

7    about Multaq?

8                   A.  Well, as the title suggests, it's

9    evaluating the top 10 drug launch disasters

10   around this time period.  So it identified

11   Multaq because of this warning and this

12    increased risk of death and cardiovascular event

13    as a failed drug launch or an unsuccessful drug

14   launch.

15                  Q.  All right.  And if we could turn

16   to DTX-199 and pull that up.  What is this

17   document?

18                  A.  This is a second third-party

19   market research report from Global Data.

20                  Q.  And who is Global Data?

21                  A.  They are a firm that provides

22   third-party market research in the

23   pharmaceutical industry.

24                  Q.  And what is this report about?

1                      A.  This is about atrial fibrillation.

2                      Q.  All right.  If we could look at

3       page 7 of this document.  There on the left

4       column about a third of the way down there is

5       a -- yeah, right there, there's a sentence

6       starting with subsequently.  And what is this

7       sentence telling us?

8                      A.  This describes Sanofi's aim to

9       develop an effective and safe alternative to

10      amiodarone, but was identifying the increased

11       risk of death and cardiovascular events that was

12       identified in the FDA announcement.  So in other

13      words, what we expect to see is also being

14      confirmed by parties that perform market

15      analysis and identification of future

16      opportunity.

17                     Q.  And taking the three documents

18      that we've just seen together, what does this

19      tell you about Multaq's future opportunity?

20                     A.  Well in total that it's limited.

21      We don't expect Multaq sales to grow

22      substantially from here.

23                     Q.  Okay.

24                     MS. CLAYTON:  And Your Honor, we

```
 1    would offer DTX-184 and 195 and 199 into

 2    evidence.

 3                  MR. ROTHMAN:  No objection.

 4                  THE COURT:  All right.  Admitted

 5    without objection.

 6    BY MS. CLAYTON:

 7             Q.  And how does Multaq's limited

 8    future opportunity influence your opinions on

 9    commercial success?

10             A.  Well, it's another factor that

11    indicates that Multaq not only has not been

12    successful through present day, it's also

13      unlikely to become a commercial success in the

14    future.

15             Q.  Okay.  So let's turn next to your

16      fourth factor, no economic profitability.  And

17    first, what is economic profitability?

18             A.  Economic profitability is a

19      determination that weighs the benefits in terms

20      of sales and profits that occur many years down

21    the line with the cost of commercialization

22      which is significant in pharmaceuticals, to see

23       whether a product or whether Multaq has achieved

24      an economic profit.
```

1              Q.  And is economic profitability the

2      same as accounting profit?

3              A.  No, it's different.  Accounting

4       profits usually refer to profits or losses in a

5       particular calendar year, so how much did a drug

6      earn in 2015, for example.  Economic profit

7      refers to was there an economic profit over a

8      long period of time accounting for all of the

9       costs and all of the profits that were earned.

10             Q.  And why are economic profits

11                 relevant to the analysis of commercial

12     success?

13             A.  Economic profits really get at the

14     core of what commercial success is all about.

15      We're trying to answer the question, were there

16      economic incentives for the market to bring the

17     product sooner.  And if there's an economic

18     profit opportunity, then it's, you know, a

19     positive factor on that inference.

20             Q.  And have you created a slide that

21      shows what goes into an economic profitability

22     analysis?

23             A.  I have, yes.

24             Q.  And if we could look at slide 13,

```
 1    please.  You have some bullet points here, so

 2    let's go through them one by one.  First you

 3     have that the analysis includes or evaluates the

 4    incentive to develop a product.  What do you

 5    mean by that?

 6              A.  Well, there I'm referring to the

 7     purpose of the economic profit analysis, we're

 8    trying to evaluate whether based on the

 9    objective sales and profits we observe, there

10     would have been an economic incentive to bring

11    this product to market.

12              Q.  And the second primary bullet

13    point is compares sales and profits to

14    commercialization costs.  What do you mean by

15    that?

16              A.  There I'm referring to all the

17     economic costs that go into drug development and

18     drug commercialization.  So number one, cost of

19     clinical trials, we know that cost of clinical

20     trials are very expensive, hundreds of millions

21    of dollars and they occur over a very long

22    period of time.  Those are out of pocket

23     expenses.  Second there's the opportunity costs

24    of capital.  When drugs put up hundreds of
```

1      millions of dollars over a decade or more, you

2       have to get a return on the investment, so that

3      return is a real economic cost.  And third,

4        there's a risk of failure and uncertainty.  So

5      sometimes pharmaceutical companies invest in

6        research and development that ultimately doesn't

7        pan out into an FDA approved product, so if the

8        sales and profits are going to compensate firms

9      for that risk or encourage them to bring the

10       product to market sooner, it's another economic

11      cost that needs to be taken into account.

12              Q.  All right.  And finally, you have

13       here highlighted, are the expected profits worth

14      the risk?  What do you mean by that?

15              A.  That's really the result of the

16      economic profit analysis.  You're trying to

17      weigh these cost of commercialization against

18       sales and profits that don't occur for 10 or 15

19       years and determine whether -- you know, which

20      one is larger.

21              Q.  And on this slide you also have

22      two papers listed.  Why did you include those

23      papers in this slide?

24              A.  These papers are two of a series

5567

```
 1      of peer-reviewed publications in the economic

 2       literature that studies this question of cost of

 3      drug development.  There's probably a dozen

 4      papers or more on this topic over the years.

 5       These are two of the core papers and two of the

 6      most widely cited papers on the topic.

 7                  Q.  And the most recent one, is that

 8      the 2016 one?

 9                  A.  Yes, this is DiMasi, et al., 2016,

10      in the Journal of Health Economics.

11                  MS. CLAYTON:  Your Honor, that's

12       JTX-228 and we would offer that in evidence at

13      this time.

14                  MR. ROTHMAN:  No objection.

15                  THE COURT:  All right.  That's

16      admitted without objection.

17      BY MS. CLAYTON:

18                  Q.  Does the DiMasi 2016 paper discuss

19      how expensive it is to bring a new drug to

20      market?

21                  A.  It does.

22                  Q.  And what do they estimate that

23      expense to be?

24                  A.  Well, the literature has long
```

```
1      agreed for decades that it costs more than a
2       billion dollars to bring a new drug to market.
3      The most recent estimate by DiMasi 2016 and
4       others are that it's in excess of two billion.
5               Q.  Based on the DiMasi paper, did you
6      do a calculation about the estimated cost for
7      bringing Multaq to market?
8               A.  Yes.
9               Q.  And have you prepared a slide that
10     shows how you used the DiMasi paper in your
11     assessment of Multaq?
12              A.  Yes, I have.
13              Q.  If you could bring up the next
14      slide.  This is slide 14.  You have two columns
15     or three columns.  You have description, then
16     the DiMasi paper and Multaq.  So can you
17     describe for us here how you use the DiMasi
18      paper to arrive at these entires for Multaq over
19     here?
20              A.  Yes.  The exercise here is to
21      determine whether the facts and circumstances of
22     Multaq are similar to the DiMasi 2016 study.
23      And you can see that in this situation they are
24      quite similar.  In terms of the product type,
```

      1        DiMasi and its co-authors studying new chemical

      2      entities.  Multaq is of course a new chemical

      3      entity.  The drugs studied in DiMasi 2016

      4      received FDA marketing approval from 2005 to

      5       2013.  Multaq, in 2009, falls squarely in that

      6        range.  There was initial clinical testing for

      7       the drugs in the DiMasi paper from 1995 to 2007.

      8      Multaq, again, is right in the middle of that

      9        range in 2001.  The average time to approval is

     10        8.1 years in the published literature.  Multaq

     11      is 7.7 years, very similar.  And the time of

     12       clinical testing from the published literature

     13        is 7.9 years, compared to Multaq as 12.4 years

     14      since clinical testing has been substantially

     15      ongoing even after approval.

     16            Q.  And in addition to the information

     17       from DiMasi, did you use other information from

     18      Sanofi to a arrive at the cost of

     19      commercialization?

     20            A.  Yes, I did.  So part of the

     21      inquiry here is to determine the actual facts

     22      related to Multaq, when it received marketing

     23       approval, when the clinical trials took place.

     24      And I used Sanofi information in order to do

1      that.

2                Q.  Okay.  And what did you arrive at

3      for the cost of commercialization for Multaq?

4                A.  The DiMasi paper provides an

5      estimate of 2.59 billion for an average drug.

6      Based on when Multaq came to market, I've

7      estimated 2.39 billion for Multaq.

8                Q.  All right.  And are you aware of

9      any factors that would indicate a potentially

10       even higher commercialization cost for Multaq?

11               A.  Yes, because the clinical trials

12                 for Multaq have been substantial,

13   they've been

14    more than the average drug, if anything, I'd

15    expect this to be higher.

16               Q.  So in your opinion is this a

17    conservative estimation of the cost of

18    commercialization of Multaq?

19               A.  Yes.

20               Q.  Now, is this the same cost of

21    commercialization that was in your expert

22    report?

23               A.  It's very close.  It's slightly

24    different because the DiMasi 2016 paper only

1           came out in March of this year after my expert

2           report.  I had estimated what development costs

3           would have been for a drug released around this

4           time and had estimated something actually within

5      $20 million of what the DiMasi estimate

6      ultimately turned out to be.

7                     Q.  Using the cost of

8      commercialization here, did you perform an

9        economic profitability calculation for Multaq?

10                    A.  Yes, that's on the next slide.

11                    Q.  And that is slide 15 for the

12     record?

13                    MR. ROTHMAN:  Your Honor, we have

14     an objection to this exhibit as well.  This

15     demonstrative refers to DTX-11, which is a

16     document that internally relies on a Sanofi

17       document that this witness was not able to lay

18     the proper foundation for in his testimony.

19                    MS. CLAYTON:  And again, I can lay

20     that proper foundation now, Your Honor.

21                    THE COURT:  All right.  Why don't

22     you do that.

23     BY MS. CLAYTON:

24                    Q.  If you could turn to JTX-238 in

```
1          your binder.  And Ted, if you could bring that
2          up on the screen as well.  Did you use this
3          document in performing -- in some of the
4          calculations that we see on slide 15?
5                    A.  Yes, I did.
6                    Q.  And what is this document?
7                    A.  This document provides expected
8          sales and costs for Multaq.
9                    Q.  And who generated this document?
10                   A.  This was provided by Sanofi.  I
11         believe they generated it.
12                   Q.  Okay.  And how did you go about
13         obtaining this document?
14                   A.  I obtained this document by
15         searching for electronic production.  I'm
16          unaware of Sanofi providing official profit and
17          loss calculations for Multaq retrospectively, so
18          this was the best information on profits that I
19         could find.
20                   Q.  So you said that you searched
21          electronic documents.  Was that Sanofi's entire
22         production database?
23                   A.  Yes.
24                   Q.  And was this the -- in your
```

```
 1    opinion, the most accurate estimation of the
 2    costs that you could find?
 3            A.  It is, combined with information
 4    from other documents as well.
 5            Q.  Okay.  And upon a review of this
 6     document, what year do you believe this document
 7    was created?
 8            A.  I believe it was created in the
 9     late 2000's, likely around 2009.  You can see in
10      the assumptions and comments here that 2009 to
11    2011 is based on a budget for 2009 and
12    long-range plan for 2010 and 2011.  Those
13      commonly refer to the current year or the next
14    year as well as planning into the future.
15            Q.  What about this document makes you
16    think it's a Sanofi document?
17            A.  Well, Sanofi of course is the
18    company selling Multaq at the time.  It comes
19    from their production and this is exactly the
20     kind of planning and profit calculation I expect
21    them to perform.
22            Q.  Now, at your deposition, I don't
23    think you gave a specific year as to when you
24    thought this was created; is that right?
```

```
1              A.  That's correct.  There was some

2      back and forth at deposition on this.

3              Q.  And based on a further review of

4       the document, I think you said you believe it's

5      created in 2009; is that right?

6              A.  Yeah, correct.  When the document

7       was first provided to me at deposition, I didn't

8        see a date on it immediately.  There's no date

9      in the title, no date in a footnote, so I

10      originally didn't see that, but as we were doing

11      the question and answer, I noticed these

12       assumptions in comments and was able to provide

13        essentially the same answer that I did here at

14      trial.

15              MS. CLAYTON:  Your Honor, we would

16       offer JTX-238 into evidence and believe that he

17       established a sufficient foundation to use this

18      for his calculations.

19              THE COURT:  Is it JTX-238 that the

20      objection is to?

21              MR. ROTHMAN:  Yes, that's correct,

22      Your Honor.

23              THE COURT:  All right.  Well, I'm

24      going to admit it and you may proceed.
```

```
 1                    MS. CLAYTON:  Thank you, Your

 2        Honor.

 3        BY MS. CLAYTON:

 4                    Q.  If we can go back to slide 15 and

 5         there's a lot of information on this slide, so I

 6        want to break it down one by one.  And I see

 7        that first you have highlighted 2015.  Why do

 8        you have 2015 highlighted here?

 9                    A.  That represents a calculation of

10         sales and profits through present day or through

11          the end of last year.  That represents the, in

12        other words, the objective sales in evidence

13        that have already occurred.

14                    Q.  Okay.  And in 2015, what did you

15        calculate to be the present value cumulative?

16                    A.  Negative 1.78 billion.

17                    Q.  Okay.  And how did you -- from

18         this chart, what numbers did you use to arrive

19        at that calculation?

20                    A.  Well, you can see the three

21         columns here.  The first column are the actual

22        profits and losses of Multaq over time.  So

23         those are based on revenue information from the

24        20F's as well as the cost information we
```

```
 1    reviewed in the previous document as well as

 2    other documents.  The second column is the

 3    present value in 2009 dollars of those future

 4    cash flows.  It's standard practice in an

 5     analysis like this to discount future sales for

 6    risk and uncertainty, so I've done so here,

 7     discounted back to 2009.  You can see the top of

 8    that column, that's the R & D figure for the

 9     commercialization costs from the previous slide,

10    that's what we're trying to weigh the profits

11     against.  And in the third column is the present

12     value of the profits and losses on a cumulative

13     basis.  So we start with the negative amount or

14     the investment into the product and we're trying

15      to ask the question, do the profits ultimately

16    become positive over time.

17              Q.  Okay.  And so the profit and lost,

18     we start up here with -- or R & D, the cost of

19    commercialization as we saw on your previous

20    slide; is that right?

21              A.  Yes.

22              Q.  And then what other information

23     did you use to arrive at that 253 number there?

24              A.  That's based on the revenue
```

```
 1    information reported by Sanofi as well as the

 2    cost information from internal documents.

 3              Q.  All right.  And if you could turn

 4     your binder to DTX-1, DTX-3, DTX-8, JTX-238 that

 5    we looked at before, JTX-238 and JTX-240, are

 6    those the calculations and documents that you

 7    used in arriving at this 253 number in the

 8    profit and loss column?

 9              A.  Yes.

10              MS. CLAYTON:  Your Honor, some of

11    those have already been admitted.  We'd offer

12    DTX-8, JTX-239 and JTX-240 into evidence.

13              MR. ROTHMAN:  Our only objection

14    is to the extent they rely on the document

15    previously objected to, but you've overruled

16    that objection.

17              THE COURT:  All right.  So noted

18    and otherwise admitted without objection.

19    BY MS. CLAYTON:

20              Q.  Now, let's focus again on the

21    present value in 2009 dollars, the 114 number

22     that you list there.  Now, I think you mentioned

23      that you used a discount in arriving at the 114

24    number; is that right?
```

1                  A.  Yes, I used an 11 percent discount

2          for the cost of capital in the pharmaceuticals

3          industry.

4                  Q.  So you start again with the cost

5          of commercialization number and use a discount

6          to arrive at the 114.  Any other information

7          that you used to arrive at that 114 number?

8                  A.  Well, this is a calculation using

9          that discount rate of 11 percent, that does take

10         into account the opportunity cost of the

11         capital.  It does not take into account

12          potential risk that those sales might not occur.

13         For example, if there's generic entry, sales

14          into the future, at least from the perspective

15          of 2009 may not occur, so that's the additional

16         risk that could push the discount rate even

17          higher to make the economic profits even lower.

18                 Q.  So for your number here, though,

19         you didn't take that additional risk into

20         account, right?

21                 A.  Correct, I just used the

22         opportunity costs of capital.

23                 Q.  And so in your opinion, is this a

24         conservative number that you used here?

1               A.  It is.

2               Q.  And quickly, if you could look at

3       DTX-8, DTX-11, DTX-296, JTX-144 and JTX-145 in

4    your binders, are those the calculations and

5    underlying documents that you used to come up

6    with the 114 number in this chart?

7               A.  Yes.

8               MS. CLAYTON:  And again, only one

9    isn't in evidence and Your Honor, we'd offer

10   DTX-11 into evidence.

11              MR. ROTHMAN:  To the extent that

12   doesn't rely on DTX-238, we don't have an

13   objection.

14              THE COURT:  All right.  It's

15   admitted without objection other than the

16   caveat.

17   BY MS. CLAYTON:

18              Q.  So for the 2015 calculation,

19   again, what is the present value cumulative?

20              A.  Negative $1.78 billion.

21              Q.  And what does that tell you about

22   the commercial success of Multaq?

23              A.  Through present day Multaq has not

24   recouped its commercialization costs.

```
 1                    Q.  Okay.  And you also have

 2        highlighted on here 2023.  What does that line

 3     represent?

 4                    A.  That represents the projections

 5        put forward by Mr. Tate yesterday and the result

 6     in economic profit if those future sales are

 7     included.

 8                    Q.  Is there a difference between the

 9     number you arrived at here and the number Mr.

10     Tate arrived at?

11                    A.  There's a difference in the

12        economic profit, because we have a dispute over

13     what the commercialization costs are, but

14     there's no difference in the profit and loss

15        figures that we use.  We use the same revenue,

16     the same projections and the same cost

17     allocation.

18                    Q.  Right.  And if you look at PTX-286

19        in your binder, is that the calculation that Mr.

20     Tate used for those numbers?  It's up on the

21     screen, if that's easier.

22                    A.  Yes, it is, as well as the next

23     page of this exhibit.

24                    Q.  And is that -- and you based your
```

```
 1          numbers from 2016 to 2023 in the previous chart

 2      on these calculations done by Mr. Tate?

 3              A.  Yes.  And if you show the next

 4       page of this exhibit, I believe you'll see all

 5       the same figures there.  So here you can see the

 6       same figures under nominal worldwide profits and

 7      you can see the same figures in the present

 8       value of worldwide profits in the column all the

 9      way on the right.

10              Q.  And if we could go back to slide

11       15.  Projecting out to 2023 as Mr. Tate did and

12      using his underlying analysis, what did you

13       determine the present value cumulative of Multaq

14      to be in that year?

15              A.  Negative 1.15 billion.

16              Q.  And what does that tell you about

17      the commercial success of Multaq?

18              A.  Not only has it not been a

19      commercial success to date, it's unlikely to

20      recoup its investment and become a commercial

21      success.

22              Q.  Have you also determined whether

23       Multaq would be profitable when the '167 Patent

24      expires in 2029?
```

1                   A.  I have.

2                   Q.  And what was your determination in

3       that regard?

4                   A.  Even pulling the calculations out

5       through 2029, it still does not achieve an

6       economic profit.

7                   Q.  All right.  In this chart your

8       profit and loss calculations assume certain

9        projected levels of annual costs; is that right?

10                  A.  Yes.

11                  Q.  Is that the Sanofi document that

12      we discussed in a little more detail earlier?

13                  A.  In part, yes.

14                  Q.  And have you considered whether

15       Multaq would be profitable assuming lower annual

16      costs for Multaq?

17                  A.  I have.  There was some discussion

18      at my deposition on potential alternative

19       parameters for costs.  I've run the numbers both

20      ways and no matter what set of parameters you

21      use, there's no economic profit here.

22                  Q.  So in sum, what is your opinion

23      regarding Multaq's economic profitability?

24                  A.  That it has not earned an economic

1    profit to date and it's unlikely to ever earn an

2    economic profit.

3              Q.  And how does that influence your

4    opinions on commercial success?

5              A.  It indicates that Multaq is not a

6    commercial success and will not become a

7    commercial success in the future.

8              Q.  Okay.  Now, we've briefly

9    discussed Mr. Tate's opinions on economic

10    profitability.  You were here for his testimony

11    on that yesterday?

12              A.  I was.

13              Q.  And do you agree with his opinion

14    on economic profitability?

15              A.  No.

16              Q.  And have you created a

17    demonstrative that shows the differences in your

18    calculation versus Mr. Tate's calculation?

19              A.  Yes, I have.

20              Q.  And if we could bring that up,

21    it's slide 16.  So could you describe here what

22    you're showing in this slide?

23              A.  Yes.  This slide shows a

24    comparison of the calculations put forward by

1        Mr. Tate and the calculations that I've put

2        forward.  There are actually quite a lot of

3         similarities between the two calculations.  We

4        both use the same academic literature to get

5         commercialization costs.  And we have the same

6        adjustments to make them specific for Multaq.

7        We have the same profits and losses, the same

8         projections.  There's really only one difference

9        which is that he does not include the risk of

10       failure in his calculations and I do.

11                Q.  And in your opinion is it

12       appropriate to exclude the risk of failure as

13       Mr. Tate did?

14                A.  No.

15                Q.  And why not?

16                A.  Excluding the risk of failure

17       excludes a real economic cost that's based by

18        pharmaceutical companies.  When a pharmaceutical

19        company is thinking about whether a product has

20        a sufficient market opportunity to want them to

21       bring it to market, they think about the fact

22        that they might invest hundreds of millions of

23        dollars in development or clinical trials that

24        ultimately might not receive any profit at all.

```
1        So it's a real risk that's evaluated.  It's a

2        cost that's taken into account in all the

3        academic literature on this topic and it's a

4        costs that's inappropriately removed by Mr.

5        Tate.

6                Q.  And so what number did Mr. Tate

7         arrive at and what number did you arrive at for

8        economic profitability?

9                A.  Well, for commercialization costs,

10       this is the difference.  You can see the 1.04

11        billion in the commercialization costs for Mr.

12        Tate.  That takes out the risk of failure.  And

13       the 2.39 billion in my calculations.  And one

14        point that be may be helpful to clarify as well,

15        is that Mr. Tate described this as me assigning

16       the costs of failed drugs to these

17        commercialization costs.  That's the wrong way

18        to think about it.  That's what they do in the

19       academic literature in order to determine the

20       risk of failure.  You want to determine how

21        likely is it and what are the costs of persuing

22       success as well as drugs that do not receive

23        approval.  But the purpose is to get the risk of

24        failure and that's a real economic cost.
```

1                    Q.   And the actual profit that you

2           calculated and Mr. Tate calculated, what were

3           each of those numbers?

4                    A.   Well, through 2015, both

5           calculations show no economic profit to date.

6            Mr. Tate is at negative .54 billion and mine is

7            at negative 1.78 billion.  And when you project

8           through 2023, in other words seven years from

9           now, Mr. Tate's calculations barely become

10          positive at just $200 million.  And mine are

11           still quite significantly negative at minus 1.15

12          billion.

13                   Q.   So Doctor McDuff, we've just gone

14          through the economic profitability of Multaq.

15          We've already discussed the factor related to

16           the sales of Multaq, it's market share and it's

17          future opportunity.  Based on all of these

18           factors that we have just discussed, what do you

19           conclude about the commercial success of Multaq?

20                   A.   Well, based on the economic profit

21          analysis, it indicates Multaq has not been a

22           commercial success and is unlikely to become a

23          commercial success.

24                   Q.   Yesterday I believe Mr. Tate

1          testified that the existence of ANDA filers is

2           evidence of commercial success.  Do you recall

3          that testimony?

4                    A.  I do.

5                    Q.  And do you agree with that?

6                    A.  No, because there's a fundamental

7          difference in the commercialization costs

8           between branded drug companies and generic drug

9           companies.  Just because a generic drug company

10          is interested in filing an ANDA application and

11          providing a generic product doesn't mean that a

12         branded pharmaceutical company would have the

13          same economic incentives to bring that product

14          to market from scratch.  So if you're thinking

15          about commercial success as incentives to bring

16         the product to market sooner, the evidence of

17         generic filers is not -- does not show

18         commercial success of the product.

19                    Q.  All right.  Now, let's switch

20         gears a little bit and talk about your fifth

21          point, which is blocking patent and exclusivity.

22         What is a blocking patent?

23                    A.  A blocking patent is a term that

24         refers to a patent that blocks or prevents a

```
 1    competitor from commercializing the product.

 2              Q.  And exclusivity, what do you mean

 3    by that here?

 4              A.  That refers to regulatory

 5    exclusivity granted by the FDA.

 6              Q.  Okay.  And to discuss both of

 7    these, let's look at JTX-227.  What is this

 8    document?

 9              A.  This document is the FDA Orange

10    Book for Multaq.

11              Q.  Okay.  And what is -- if we could,

12     Ted, pull up the charts that are underneath that

13    heading.  What is this chart showing?

14              A.  This chart shows the patents that

15    are listed in the FDA Orange Book for Multaq.

16              Q.  Okay.  And in addition to the '167

17     Patent, how many other patents are listed in the

18    Orange Book?

19              A.  Five other patents.

20              Q.  And the first one listed there is

21    the '510 Patent.  Do you see that?

22              A.  Yes.

23              Q.  What is the understanding of the

24    subject matter of that patent?
```

```
1                A.   That patent provides the

2      Dronedarone compound.

3                Q.   What people refer to as a compound

4      patent?

5                A.   Yes.

6                Q.   And is it your understanding that

7       compound patents are frequently referred to as

8      blocking patents?

9                A.   Yes, that's generally accepted.

10                Q.   And what is your basis for that

11      understanding?

12                A.   Based on my professional

13       experience and work on this kind of technology.

14                Q.   Does the presence of a blocking

15                patent change the way you think about

16   commercial

17       success?

18                A.   Yes.  What a blocking patent does

19       is even if there is a commercial opportunity or

20       even if a company might have been interested in

21       bringing a product to market, a blocking patent

22       limits the economic relevance of that commercial

23      opportunity because companies would have been

24      prevented from commercializing that product
```

1    sooner.

2            Q.  Now, if we could go back to the

3    full Orange Book for a moment and right now I

4    just want to focus on the exclusivity section

5     down there.  What is this exclusivity section in

6    the Orange Book telling us?

7            A.  This refers to FDA regulatory

8    exclusivity.

9            Q.  And I see under the exclusivity

10   code, it says NCE.  What does that mean?

11           A.  That is new chemical entity.

12           Q.  So what is having new or NCE

13   exclusivity, what does that afford Sanofi?

14           A.  That provides that Sanofi will be

15    the only entity selling a Dronedarone product.

16   Also, generic ANDA filers need to wait until one

17    year before the exclusivity period ends in order

18   to file an ANDA application.

19           Q.  Okay.  And how does the existence

20   of this exclusivity for Sanofi influence your

21   analysis on commercial success?

22           A.  It's another factor even outside

23    of the blocking patent that limits the economic

24   relevance of commercial success since other

1       entities would be prevented from commercializing

2       a Dronedarone product.

3                  Q.  Okay.  So taking both the '510

4       blocking patent and the NCE exclusivity

5       together, how do these together impact your

6       analysis of commercial success?

7                  A.  Both of those factors indicate

8       that even if there were a commercial

9       opportunity, the economic relevance of

10      commercial success is not significant here.

11                 Q.  And why is that?

12                 A.  Because both of these items, the

13       blocking patents and the exclusivity, they get

14      in the way of this incentive to bring the

15      product to market sooner.  So it kind of cuts

16      through even if there were a commercial

17      opportunity what the inference can be about

18      commercial success.

19                 Q.  So now let's go to the last topic

20       in your primary findings, no demonstrated nexus.

21      First, what is a nexus?

22                 A.  A nexus is a factual or economic

23       connection between the patents in suit and sales

24      or use of a product.

```
 1                    Q.  And how does an analysis of nexus

 2           fit within the analysis of commercial success?

 3                    A.  It's one factor that's frequently

 4                 evaluated in evaluating commercial

 5      success.  If

 6                 commercial success is due to factors

 7      besides the

 8                 claimed invention, then there are

 9      limits on what

10                 one wants to infer about the claimed

11      invention

12        from any commercial success.

13                    Q.  And in your understanding, did Mr.

14        Tate offer an opinion on nexus?

15                    A.  I understand he did not.

16                    Q.  What about Doctor Reiffel, in your

17        understanding did he offer an opinion on nexus?

18                    A.  I understand he offered an opinion

19                 that there is a nexus between sales of

20      Multaq or

21        use of Multaq and the '167 Patent.

22                    Q.  And in your understanding, what

23        did he base that on?

24                    A.  That was based on his, his
```

```
1    clinical experience prescribing the drug.

2            Q.  Okay.  And did you find Doctor

3    Reiffel's opinion complete and satisfactory?

4            A.  No, not in my view.

5            Q.  And why not?

6            A.  Primarily because Doctor Reiffel

7     and Plaintiffs more generally failed to analyze

8     the other technologies or other patents that are

9    related to Multaq, not just the '167 Patent.

10           Q.  What is your understanding about

11   whether or not Multaq is given only to the

12   patients described in the '167 Patent?

13           A.  My understanding is that it has

14    use outside of the patient population alleged to

15   be covered by the '167 Patent.

16           Q.  And what effect does including

17   these patients have in the nexus analysis?

18           A.  Well, what it says is that because

19     there's a group of patients that's known to be

20   outside the '167 Patents, Plaintiffs are

21   attributing some sales or some commercial

22   success where there's no nexus at all.

23           Q.  Okay.  And I think you also

24    mentioned that he ignored the other patents that
```

```
 1       are covering Multaq; is that right?

 2                   A.  Yes.

 3                   Q.  If we could bring up JTX-277

 4       again --

 5                   MS. CLAYTON:  And Your Honor,

 6       before I think I failed to offer this into

 7       evidence, so I'd offer JTX-227 into evidence.

 8                   MR. ROTHMAN:  No objection.

 9                   THE COURT:  I'm sorry, JTX what?

10                   MS. CLAYTON:  227.

11                   THE COURT:  Okay.  All right.

12       Admitted without objection.

13       BY MS. CLAYTON:

14                   Q.  And I believe earlier you said

15        that the '510 Patent here is a compound patent,

16       right?

17                   A.  Yes.

18                   Q.  Does the presence of the '510

19        Patent, which is the compound patent, effect the

20       nexus analysis in your opinion?

21                   A.  Yes, it does.  Because the

22       compound patents are generally known to be a

23       strong driving contributor to sales and so to

24        ignore or to not even think about the presence
```

1    of the compound patent relevant to the

2     contribution of the '167 Patent, falls short of

3    demonstrating a nexus in my view.

4                 Q.  Now, we also see listed here a

5    '493 Patent and an '800 Patent.  What is your

6     understanding of what these patents relate to?

7                 A.  I understand these to provide

8    formulations of Multaq.

9                 Q.  Okay.  And does the presence of

10   formulation patents such as these effect the

11   nexus analysis?

12                A.  Yes, again these are other

13   contributing factors or contributing

14    technologies to Multaq and they are factors that

15   haven't been examined by Plaintiffs at all.

16                Q.  And I also see that there are two

17    other patents listed here, the '215 and the '900

18   Patents.  Do you see those?

19                A.  Yes.

20                Q.  And is it possible that the

21    presence of these patents also effect the nexus

22   analysis?

23                A.  Yes.  And they have not been

24   analyzed by Plaintiffs.

```
 1              Q.  Okay.  So to your knowledge have

 2        Plaintiffs provided any analysis of the nexus to

 3         the commercial sales of Multaq to any of these

 4        other patents that we just discussed?

 5              A.  No.

 6              Q.  And what does that lead you

 7        conclude about Plaintiff's nexus analysis?

 8              A.  Well, in my view, for the reasons

 9        we've discussed, Plaintiffs have not

10        demonstrated a nexus in this case.

11              Q.  And so before we conclude, I just

12        want to summarize for the Court your overall

13         opinions here on the last slide in 19.  Can you

14        just remind us of your overall opinions?

15              A.  Yes.  Number one, Multaq has not

16        been a commercial success and is unlikely to

17        become a commercial success in the future.

18        Number two, there were disincentives for

19         development in the form of blocking patents and

20         exclusivity that limit the economic relevance of

21        commercial success even if it exists.  And

22         third, Plaintiffs have not demonstrated a nexus

23         between the patents in suit and sales of Multaq.

24              MS. CLAYTON:  Your Honor, one
```

```
 1        housekeeping matter.  I failed to admit DTX-1,

 2     which is one of Mr. McDuff's underlying

 3      calculations and I would offer it at this time.

 4                MR. ROTHMAN:  We have no objection

 5     to that.

 6                THE COURT:  Okay.  Admitted

 7     without objection.  Actually, can we just go

 8     back before we do the cross.  The slide that

 9     compares him and Mr. Tate on the --

10                MS. CLAYTON:  Slide 16?

11                THE COURT:  Put it up and we'll

12     see.  Yes.  Doctor McDuff, the reason the

13      commercialization costs which you say reflects

14     the risk of failure in yours but not in Mr.

15     Tate's and seems to be $1.3 billion worth of

16     difference, that's because of money -- just

17      explain to me how the risk of failure translates

18      into dollars.  Maybe you did this already once.

19     I didn't quite get it.

20                THE WITNESS:  The way it works, in

21     the literature they are trying to provide the

22      total cost of bringing a new drug to market.  So

23       if you have some projects that go forward, you

24      incur some phase one costs, maybe some phase two
```

```
 1    costs, you get failure.  You spend that money
 2     and you never recoup that money.  And sometimes
 3     you have a drug that gets all the way through to
 4    clinical trials.  So if you're thinking about
 5     the total cost of bringing a new drug to market
 6     or the ex ante cost, thinking about the expected
 7    cost going forward, you have some chance of
 8    success and some chance of failure.  And the
 9     data indicate that more than three quarters of
10     drugs never get approval.  And so a drug company
11      thinking about the total economic cost, and as
12      in the economic literature, takes this risk of
13    failure in that calculation.
14              THE COURT:  So if say Sanofi had
15    developed, we'll just call it Compound Z, and
16     done some trials or does the work with that and
17    eventually dropped it as being a non-starter,
18    that could go into this 2.39 billion figure?
19              THE WITNESS:  That's not really
20    the right way to think about it.  It's not if
21     they spent more money on other drugs that would
22    go into this figure.  It's more that when
23     they're starting for Multaq, there's some risk
24      that Multaq will not receive approval.  So it's
```

```
 1    unrelated to the amount that's spent on other

 2     drugs.  That's just how it's calibrated in terms

 3    of getting the risk of failure.

 4              THE COURT:  So that -- so that's

 5    kind of the reason I'm asking the question,

 6    because -- and I got that you had your 2.39

 7    billion figures come from DiMasi or whatever,

 8    but the actual -- is this kind of like an

 9    overhead cost?

10              THE WITNESS:  Not really.  It's --

11     the purpose is to try to get at the notion that

12     the sales and profits need to be big enough in

13    expectation that I might be able to get those

14    sales and profits and I might not when I'm

15    embarking on the commercialization process.

16              THE COURT:  So you say ex ante.

17    If you think about it and you've got five

18    potential drugs you can pursue and trials and

19     all that and you think 80 percent of drugs that

20     we start off with fail, then what you're saying

21    is that you need to think of one of those as

22    returning a lot more profits than are just

23    associated with that particular drug because

24     you've got to cover the fact that you can't tell
```

```
 1     which ones are going to fail and which ones are

 2     going to succeed?

 3                    THE WITNESS:  Yes, that's exactly

 4     right.

 5                    MS. CLAYTON:  Thank you, Your

 6     Honor.  No further questions.

 7                    THE COURT:  All right.  Mr.

 8     Rothman.

 9  BY MR. ROTHMAN:

10                    Q.  Good morning.  Nice to see you

11     again.

12                    A.  Good morning.  Nice to see you.

13                    Q.  If you had the actual amount that

14     Sanofi spent to develop Multaq, that would be

15     much less than the number you're suggesting,

16     right?

17                    A.  In terms of out of pocket

18     expenses?

19                    Q.  Right.

20                    A.  That's correct, because the

21      dollars themselves don't account for opportunity

22     cost and risk of failure.

23                    Q.  The actual cost of developing

24      Multaq is much different than the number you're
```

```
 1    suggesting because you include the risk of

 2    failure, right?

 3              A.  I wouldn't put it that way.  They

 4    are just two different measures.

 5              Q.  Okay.  I just have a few questions

 6    about how we got here.  Who contacted you

 7    initially about this case?

 8              A.  I believe it was Carlson and

 9     Caspers.  They represent one of the Defendants

10    that's no longer in the case.

11              Q.  When did they contact you?

12              A.  Sometime in the fall of last year.

13              Q.  And you served an expert report in

14    this case, right?

15              A.  Yes.

16              Q.  And you were deposed in this case

17    by me, right?

18              A.  I was.

19              Q.  And Sandoz and Watson weren't at

20    that deposition, were they?

21              A.  I don't believe so.

22              Q.  In fact, no one here in this room,

23    I don't think, other than me was at that

24    deposition, right?
```

```
 1                    A.  I believe that's right.

 2                         MS. CLAYTON:  Your Honor, I just

 3       object to the relevance of these questions.

 4                         THE COURT:  Overruled.

 5   BY MR. ROTHMAN:

 6                    Q.  All right.  You're not a medicinal

 7       chemist, right?

 8                    A.  No, I'm an economist.

 9                    Q.  You're not a pharmaceutical

10       formulator?

11                    A.  No.

12                    Q.  You're not an expert in the

13       medical field, are you?

14                    A.  In the application of economics in

15       that area, yes, but not as a clinician.

16                    Q.  Before you worked on this case,

17       you didn't have any experience with atrial

18       fibrillation, right?

19                    A.  Not specifically.

20                    Q.  You didn't have any experience

21       with Multaq?

22                    A.  No.

23                    Q.  You didn't ever do any work on

24       antiarrhythmics, right?
```

```
 1                   A.  Not before this case.

 2                   Q.  And as we said, you served an

 3       expert report in this case, right?

 4                   A.  Yes.

 5                   Q.  And you used your best judgment at

 6       that time in arriving at the opinions in your

 7       expert report, isn't that right?

 8                   A.  I certainly did my best to do so.

 9                   Q.  All right.  Let's -- you learned a

10        little bit about afib treatment throughout your

11       work in this case, right?

12                   A.  Yes.

13                   Q.  Management of afib involves three

14       objectives, right?

15                   A.  That's my understanding.

16                   Q.  One of those is rate control?

17                   A.  Yes.

18                   Q.  Prevention of thromboembolism?

19                   A.  Yes.

20                   Q.  Correction of rhythm disturbance?

21                   A.  Yes.

22                   Q.  The rate control strategy is

23        prescribing drugs that primarily focus on rate

24       control?
```

1          A.  It is, yes.

2          Q.  The rhythm control strategy means

3    prescribing a drug focused on rhythm control,

4    right?

5          A.  If a physician chooses to go that

6    way, yes.

7          Q.  And antithrombic drugs address the

8    obstruction of blood vessels in blood clots,

9    right?

10         A.  Yes.

11         Q.  Rhythm control drugs are sometimes

12   referred to as antiarrhythmic drugs?

13         A.  They are.

14         Q.  Sometimes called AAD's?

15         A.  Yes.

16         Q.  Before I forget this one.  You

17    mentioned the words economic profitability and

18    accounting profitability in your direct, right?

19         A.  I did.

20         Q.  And accounting profitability

21             wasn't contained in your expert report

22   anywhere,

23    was it?

24         A.  Well, it's inherent in the

```
1    economic profit calculation.

2              Q.  There's no doubt that Multaq has

3    accounting profitability, right?

4              A.  I would say that's not clear based

5    on the level of sales today.

6              Q.  Billions of dollars it's made from

7    2009 through till 2014, you don't think that

8    shows accounting profitability; is that your

9    testimony?

10             A.  I would have to look.  It would be

11   close.

12             Q.  All right.  Let's talk about the

13   market for Multaq.  If the doctor chooses to

14   prescribe an antithrombic, you understand

15   Multaq's not considered, right?

16             A.  Depends at which stage you're

17   talking about.

18             MR. ROTHMAN:  May I approach, Your

19   Honor?

20             THE COURT:  Sure.

21   BY MR. ROTHMAN:

22             Q.  You gave a deposition in this

23   case, right?

24             A.  Yes.
```

1          Q.  I asked the questions, right?

2          A.  You did.

3          Q.  You did your best to answer the

4     questions truthfully and accurately and

5     completely, right?

6          A.  Yes.

7          Q.  Let's turn to his deposition, page

8     113, lines 4 to 7.

9               MS. CLAYTON:  I'm sorry, line

10    what?

11              MR. ROTHMAN:  Lines 4 to 7.

12    BY MR. ROTHMAN:

13         Q.  I asked you this question.  If a

14     doctor chooses an antithrombic agent, is Multaq

15     considered.  Answer, I would refer to clinicians

16    on that.  My understanding typically not.

17              Did I ask you that question and

18    you give that answer?

19         A.  You did.  I think that's

20     consistent with what I provided.  It depends on

21    what he -- when you're talking about that

22    decision point.

23         Q.  You know doctors don't substitute

24    AAD's for anticoagulants, right?

1                    A.  Not in terms of being medically

2      equivalent.

3                    Q.  And you know that AAD's are not

4        medically equivalent to anticoagulants, right?

5                    A.  That's my understanding.

6                    Q.  And you understand that

7                    Dronedarone is not used as a rate drug,

8      right?

9                    A.  I understand that it does have

10     some rate control properties.

11                   Q.  Can we pull up page 237, lines 10

12     to 14.  In your deposition I asked you, is it

13      your understanding that Dronedarone is used as a

14       rate drug?  Answer, I would defer to a medical

15        expert on that.  Generally speaking that's not

16     my understanding.

17                    Did I ask you that question and

18     did you give that answer?

19                   A.  You did.  The reason why my answer

20      is slightly different here is that I talked to

21     Doctor Zusman about that issue this week in

22      response to part of the issues that were coming

23       up in trial.  While it's not used as a rate drug

24     specifically, I understand that it does have

1     some rate control properties.

2                  Q.  You read Doctor Zusman's reports

3     in this case before the deposition, right?

4                  A.  I don't recall.  I believe so.

5                  Q.  So you had the benefit of his

6     knowledge when you gave the answer in your

7     deposition, isn't that right?

8                  A.  Certainly gave the best answer

9      that I could.  But as I indicated, I clarified

10    this week after discussions with him.

11                 Q.  You understand Doctor Zusman

12    doesn't prescribe Multaq when a patient has a

13    blood pressure over 120 solely, right?

14                 A.  He may, I'm not sure.

15                 Q.  How about if he has a heart rate

16    above 120?

17                 A.  He may, I'm not sure.

18                 Q.  Were you in court on Monday when

19     he actually provided his testimony to the Court?

20                 A.  I was not.

21                 Q.  Did you read his transcript from

22    when he testified in court?

23                 A.  No, but I discussed some of his

24    testimony with him personally.

1            Q.  And so if you found out that he

2     testified in court that if a patient walked in

3     with a blood pressure -- with a heart rate of

4      over 120 he would not prescribe Multaq without a

5     rate drug, would that surprise you?

6            A.  No, that's what I'm trying to

7     convey.  Multaq is not used, to my

8      understanding, as a rate drug exclusively.  It

9     does have some rate control properties.

10           Q.  Okay.  At that time you couldn't

11    think of any instance in which you've seen

12    Dronedarone used as a rate drug; isn't that

13    right?

14           A.  That's right.  Not from a clinical

15    perspective.

16           Q.  Let's talk a little bit about

17     Multaq's properties, compared to the other AAD's

18      in the market, okay?  Multaq's is not equivalent

19    to the other AAD's in the market; isn't that

20    right?

21           A.  That's correct.

22           Q.  And despite the generic

23     competition, Multaq is prescribed because each

24      patient is a unique circumstance that physicians

```
 1          make a determination for, right?

 2                     A.  I think that's fair.

 3                     Q.  And one of the contributing

 4          factors deriving Multaq sales are the

 5           differences in properties between Multaq and the

 6          other AAD's, right?

 7                     A.  Yes.

 8                     Q.  You compare -- so we're going to

 9          talk about benchmarks now.  You talked about

10           bench marks a little bit in your direct, right?

11                     A.  We did.

12                     Q.  You compare Multaq sales to

13          Lipitor, right?

14                     A.  I did as one cardiovascular drug

15          comparison.  Not in my testimony, but in my

16          report.

17                     Q.  Right.  That was your best

18          professional judgment was to include a

19           comparison between Multaq and Lipitor as part of

20          your analysis for commercial success?

21                     A.  Well, it was one of many factors I

22          considered, yes.

23                     Q.  You think comparing Multaq to

24          Lipitor is a good indication as to whether
```

```
1        Multaq is commercially successful, right?

2                A.  Not by itself I wouldn't rely on

3         that, but I think it helps put these sales into

4        context.  People often get confused that $350

5         million sounds like a lot in the abstract sense

6         and the purpose of that exercise is to put those

7        dollars into context in the industry and

8        cardiovascular drugs specifically.

9                Q.  Lipitor is used to treat

10       cholesterol, isn't it?

11               A.  Yes.

12               Q.  Lipitor has a larger patient

13       population than Multaq does, right?

14               A.  It does.

15               Q.  Lipitor has a larger commercial

16       opportunity than Multaq, right?

17               A.  Absolutely.

18               Q.  And Lipitor's sales are due in

19        part of the patient population that is available

20       to be treated by Lipitor, right?

21               A.  Absolutely, that's partly the

22       point.

23               Q.  And Multaq doesn't have that same

24       opportunity, does it?
```

```
1                    A.  No, it doesn't.

2                    Q.  Now, let's turn to Crestor.

3       That's a second drug you compared Multaq to,

4       right?

5                    A.  As one of many comparisons, yes.

6                    Q.  Crestor is also used to treat

7       cholesterol, right?

8                    A.  Yes.

9                    Q.  Has the same patient population as

10      Lipitor?

11                   A.  Generally, yes.

12                   Q.  Same advantages over -- same

13      advantages over Multaq, right?

14                   A.  Advantages over Multaq?

15                   Q.  As far as the commercial

16      opportunity.

17                   A.  Yes, I think it's a larger

18      commercial opportunity.  The commercial

19      opportunity for Multaq as we've seen is much

20      more limited.

21                   Q.  All right.  Now, let's turn to

22      Diovan.  You also compared Multaq to Diovan,

23      right?

24                   A.  As one of many comparisons, yes.
```

```
 1                    Q.  All right.  And when I deposed
 2          you, you didn't even know what Diovan treated,
 3      right?
 4                    A.  Not specifically, yes.  It's a
 5      cardiovascular drug.
 6                    Q.  You didn't even care, right?
 7                    A.  I just couldn't remember at the
 8      time.
 9                    Q.  But you didn't care what it
10          treated.  As far as your analysis, that didn't
11      matter?
12                    A.  I wouldn't put it that way.
13                    Q.  Can you pull up page 155, lines 13
14      to 22.  Question, but Diovan, you don't know
15          what it does?  Answer, I don't remember sitting
16      here.  Question, you just know that it's a
17      cardiovascular drug; is that right?  Answer,
18      yes.  Question, does it matter what it treats
19      for your analysis?  Answer, not particularly.
20                        I asked you those questions and
21      you gave that answer, right?
22                    A.  I did, yes.
23                    Q.  All right.  You compared Multaq to
24      oral anticoagulants, right?
```

```
1                A.  As one of many comparisons to put

2      it into context, yes.

3                Q.  And the patient population for

4       oral anticoagulants is much different than afib

5      patients, right?

6                A.  Well, they are not identical.

7                Q.  They are much different, right?

8                A.  That's a different patient

9      population, yes.

10               Q.  You also compare Multaq to calcium

11     channel blockers, right?

12               A.  As one comparison, yes.

13               Q.  And they have a different patient

14     population than Multaq, right?

15               A.  They do.

16               Q.  In your direct testimony you

17     identified what you believe is the relevant

18     market for Multaq, right?

19               A.  Yes.

20               Q.  You identified I think several of

21     them, didn't you?  There was about three of

22     them, I think?

23               A.  Yes.

24               Q.  Okay.  So if you keep any of
```

1          those -- I recognize there's a dispute between

2           the parties as to what the relevant market is,

3          but for purposes of this question, you can pick

4           any of those three markets, okay?  Do you have

5          them in your head?

6                    A.  I do.

7                    Q.  Okay.  So now if you go to slide 7

8          of your demonstrative, this is what you have

9          entitled Comparisons to the Pharma Industry.

10         You've got the first as 1st Decile, right?

11                   A.  Yes.

12                   Q.  Do all the drugs in the 1st Decile

13         fall into any of your three markets?

14                   A.  All of them, no.  Some of them

15         would, some of them would not.

16                   Q.  Okay.  And if you look at the 2nd

17         Decile, do all the products in the 2nd Decile

18         fall into any of your three relevant markets?

19                   A.  Not all of them.  Some of them

20         yes, some of them no.

21                   Q.  And for that mean line, do all of

22         those products fall into any of your three

23         relevant markets?

24                   A.  All of them?  Of course not.

1                    Q.  Okay.  All right.  Let's turn now

2       to your cost of commercialization analysis,

3        okay?  You spent a fair amount of time with that

4         on direct so we'll see what we can do with it.

5        At it's most basic level, your analysis asks the

6       question whether you make more money than it

7       costs to make, right?

8                    A.  I think that's fair.

9                    Q.  And you endeavor to calculate how

10      much profit Multaq made, right?

11                   A.  Yes.

12                   Q.  And then you calculated the cost

13      of developing Multaq, right?

14                   A.  Yes.

15                   Q.  In your report, you rely on case

16      law to support your understanding of what

17      commercial success is, right?

18                   A.  It's one of a number of factors

19      that develops my understanding.

20                   Q.  And none of the cases you rely on

21      discuss profitability, do they?

22                   A.  I would disagree with that.

23      Certainly not in concept.

24                   Q.  Okay.  We can address that in post

```
1      trial briefing.  Let's discuss where you got

2      your numbers for the costs of development of

3      Multaq, okay?

4                A.  Okay.

5                Q.  For the costs of developing

6       Multaq, you didn't use any internal Sanofi data,

7      right?

8                A.  No.  Unfortunately Sanofi did not

9      provide that information.

10                Q.  Okay.  You don't actually know how

11      much Sanofi spent on research and development

12      for Multaq, do you?

13                A.  Not to the dollar, yet the

14      estimates I've provided are reasonable and

15       reliable and they were utilized by Mr. Tate as

16      well.

17                Q.  And those estimates you rely on

18      are based on references, right?

19                A.  They are based on peer-reviewed

20      academic literature, yes.

21                Q.  And you don't believe that the

22      data you rely upon from those references uses

23      Multaq data at all, right?

24                A.  Not specifically, yet part of the
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801

1          exercise is to connect the estimates from that

2          paper to specific facts and circumstances of

3          Multaq, which is what I've done here.

4                    Q.  Okay.  And so the estimation you

5           rely upon from those articles as to the costs of

6            developing a product, as we've discussed for a

7          while, includes the costs of development

8          failures, right?

9                    A.  It includes the economic risk of

10          failure.

11                   Q.  And in your analysis, you didn't

12          provide an estimate as to what the costs of

13          development would be if you did not include

14          those development failures, did you?

15                   A.  No, because I don't think it's

16           appropriate to exclude them.  I did on my direct

17            testimony provide a comparison of Mr. Tate and

18          myself, and that is the difference.

19                   Q.  But Mr. Tate didn't do his own

20          analysis independently, did he?

21                   A.  No.  In his initial report that

22          was one of my critiques, he didn't examine

23          profits at all which I think is completely

24           inappropriate in examining commercial success.

```
1                Q.  He just took your analysis and

2                      pointed out what was wrong with it,

3        isn't that

4        right?

5                A.  In his view and as I mentioned he

6        didn't point out many things that were wrong

7        with it, only the risk of failure.

8                Q.  He pointed out a couple things and

9         we're going to get to the other ones soon, but

10        it's not fair to say that this is his analysis

11        with regard to profitability, he didn't

12        independently find those articles and come up

13         with this analysis, he merely took yours and was

14        poking holes in it, isn't that right?

15               A.  I would let him describe it.  You

16        could describe it that way.

17               Q.  Okay.  So when we look at the

18         slides and you compare the two and you say oh,

19         look, they are almost identical, that's because

20         he just took your analysis and was picking the

21        two or three things he was taking issue with,

22        it's not that he as an economics expert is

23         approaching the Court saying I think this is the

24        analysis and this is the way I would do it.
```

1     That's not the way his opinion reads, right?

2                   A.  Well, I think that's right.  But

3      this is what we do as economic experts all the

4     time.

5                   Q.  That answers my question.  Thank

6     you very much.

7                   A.  Is we provide the primary

8      critiques.  He pointed out the primary things he

9      thought were wrong and there was just two items.

10                  Q.  And you compare your profit number

11    to the cost number to reach your conclusion,

12    right?

13                  A.  Yes.

14                  Q.  And you didn't create this

15    analysis, did you, on your own, you rely on

16    publications that were out there before you,

17    right?

18                  A.  I'm not sure I understand.

19                  Q.  You weren't the first one to come

20     up with this cost of commercialization analysis,

21    are you?

22                  A.  No, it's widely available in a

23    number of papers.

24                  Q.  Right.  You rely on the publicly

```
 1    available references that teach you how to do

 2    the analysis, right?

 3              A.  Yes, absolutely.

 4              Q.  And one of the references you rely

 5    upon is Grabowski from 2002, right?

 6              A.  It is.

 7              Q.  Okay.  When you did your

 8    calculation for the cost of development, you

 9     included the entire cost of development, right?

10              A.  Yes, as I would think of it.

11              Q.  You didn't just take the first

12    five years, did you?

13              A.  No.

14              Q.  And in fact, your cost of

15     development is really just an estimate, right?

16              A.  It's a reliable estimate.

17              Q.  And it's an estimate because you

18    don't have the actual cost of development of

19    Multaq, right?

20              A.  That's correct.  Had Sanofi

21    provided it, I would have incorporated it.

22              Q.  And you feel good about estimating

23    the amount of cost for Multaq, right?

24              A.  I do.
```

```
 1                    Q.  Okay.  So now let's turn over to

 2      profits, okay?  In your expert report you

 3      calculated the profits from the years 2009 to

 4      2014, right?

 5                    A.  Correct, and I've also considered

 6      later years as well.

 7                    Q.  I'm talking about the opinions you

 8       served in your expert report.  At that time you

 9       only included profit from 2009 to 2014, right?

10                    A.  Correct, because the 2015 numbers

11                    had not come out yet.  I explained that

12    to you

13     at deposition.

14                    Q.  Right.  You didn't include any

15      profits for 2015, right?

16                    A.  Right.  They came out after my

17      expert report was served.

18                    Q.  Or 2016?

19                    A.  Not in my report, but I have

20      considered them in response to arguments from

21      Mr. Tate.

22                    Q.  I'm talking about the opinions

23       that you formed in this case and serve in your

24       expert report that you, in your words, used your
```

1    best judgment to come to, right?  When you

2    served your expert report, you just included

3    profits from 2009 to 2014, right?

4              A.  Yes, for the reasons we've

5    discussed.

6              Q.  You didn't include any future

7    profits in your analysis, right?

8              A.  Not in the NPV analysis.  I did

9    consider Multaq's future opportunity.

10             Q.  And in your professional judgment,

11   the appropriate analysis for determining the

12   cost of commercialization is to compare the

13   costs to develop Multaq against the first six

14   years of profitability, right?  That was your

15   best judgment?

16             A.  I think one can do that.  That

17    evaluates whether Multaq has been a commercial

18    success based on the objective evidence through

19    present day.  In addition, as I discussed on my

20    direct, Multaq is unlikely to turn an economic

21    profit even projecting into the future.  So the

22   conclusion is the same either way.

23             Q.  We're trying to get to your

24   professional judgment and your opinions you

```
 1    provided in your expert report.  Whether you

 2     want to change them after my deposition, that's

 3     a different story.  As far as your professional

 4     judgment when you served your expert report, you

 5     just included profits from 2009 to 2014 and did

 6    not include any future profits, isn't that

 7    right?

 8              A.  For the expert report.  And to be

 9    clear, Plaintiffs had not asserted any future

10     sales in their analysis of commercial success,

11    in Mr. Tate's opening report.

12              Q.  All right.  So you didn't include

13     future profits, right?  We can agree with that,

14     amongst everything you've said, you have agreed

15    that your professional opinion was only to

16    include profits from 2009 to 2014, right?

17              A.  For limiting to just my NPV

18    analysis in my report, that's true, but of

19     course I included Multaq's future opportunity.

20    I discussed that in my report and in my

21    testimony.

22              Q.  Let's go back and see what the

23    reference is that you rely upon say about how

24    you should do the analysis, all right?  Can
```

1          we -- we're going to go to JTX-241.  If it's not

2      in your book and you want a copy of it, I can

3      hand it up, but perhaps you're familiar with

4       this document.  What is this document, JTX-241?

5                    A.  This is one of the documents I

6                    cite in my expert report.  It's called

7      Returns

8                    On Research and Development for 1990's

9      New Drug

10     Introductions.  You can see the authors here,

11     DiMasi and Grabowski.  These are authors that

12      provide some of the widely cited literature on

13     pharmaceutical R and D.

14                   Q.  This includes the Grabowski 2002

15     reference, right?

16                   A.  It is, yes.

17                   Q.  You're familiar with this article?

18                   A.  Yes.

19                   Q.  You've relied on it before?

20                   A.  I have.

21                   Q.  Would it be fair to say you know

22     it inside and out?

23                   A.  I know it very well.

24                   Q.  Okay.  So let's turn to what

```
 1        Grabowski says is the proper way to do the

 2         analysis.  Can we turn to page 13?  On Page 13

 3         of this article it says our basic procedure is

 4        as follows:  For each knew drug in our sample

 5        worldwide sales profiles are constructed over

 6         the drugs product life cycle.  Do you see that?

 7                    A.  I do.

 8                    Q.  Okay.  And now let's turn to page

 9        16.  At page 16 under the section that says

10         life-cycle sales profiles it says the next task

11         was to estimate future sales over the complete

12        market life of these products.  20 years was

13         chosen as the expected market life.  Do you see

14        that?

15                    A.  I do.

16                    Q.  You didn't do that in your

17        analysis in your report, did you?

18                    A.  No.

19                    Q.  Thank you.

20                    A.  Because commercial success is a

21        different question.

22                    Q.  So you didn't choose 20 years as

23        the expected market life of Multaq, which is

24        what Grabowski says to do, right?
```

```
1              A.  I'm sorry?

2              Q.  You didn't use 20 years as the

3     expected market life of Multaq in your analysis

4     which is what Grabowski says to do, right?

5              A.  I didn't use 20 years.  We don't

6     know if Multaq will have patent protection that

7     long.  That's part of what this litigation is

8     about.  Generics could come on the market in two

9     years and those future sales and profits may not

10    materialize.  They inherently have some degree

11    of subjective input to them.

12             Q.  But you didn't choose 20 years,

13    did you?

14             A.  No, for the reasons I indicated.

15             Q.  Okay.  You didn't make any

16    estimation at all about the future sales of

17    Multaq in your analysis, did you?

18             A.  I have.  I presented those to you

19    this morning.

20             Q.  No, I'm talking about in the

21    opinions that you served in your report, not the

22    ones you generated after my deposition.  In the

23    report that you generated for this case that was

24    based on your best professional judgment, you
```

```
 1          didn't estimate any future sales, did you?

 2                    A.  I developed those opinions prior

 3          to deposition and I explained them to you.

 4                    Q.  So you developed the opinions and

 5           then you didn't include any future sales in your

 6          report; is that what you are saying?

 7                    A.  You're timing is backwards.

 8                    Q.  Are there any future sales in your

 9          expert report?

10                    A.  I've already responded no for the

11          reasons we have discussed.

12                    Q.  Okay.  Thank you.  Let's turn to

13          Exhibit 235.  Do you recognize this document?

14                    A.  I do.

15                    Q.  What is it?

16                    A.  It's a Cowen and Company market

17          analyst report.

18                    Q.  This is one of those equity

19          research documents, right?

20                    A.  It is.

21                    Q.  It's the kind of document you rely

22          on in your work, right?

23                    A.  It is.  I believe I cited this one

24          specifically.
```

```
 1                    Q.  But this didn't show up in your

 2         direct examination, did it?

 3                    A.  No.

 4                    Q.  You cited other equity reports,

 5         right?

 6                    A.  In part, yes.

 7                    Q.  Okay.  This document is dated --

 8         what's the date on this document?

 9                    A.  September 2015.

10                    Q.  All right.  And these Cowen equity

11         research people, they were able to forecast

12         future sales for Multaq, right?

13                    A.  That's part of their report, yes.

14                    Q.  They projected Multaq sales going

15         up to 500 million euros, right?

16                    A.  Yes.  And as I indicated at

17         deposition, I think that's an optimistic

18         projection, particularly in light of the

19          collection of expert reports that Mr. Tate and I

20         have used for the NPV analysis.

21                    Q.  But these Cowen people don't have

22         any relationship to this litigation, do they?

23                    A.  Not that I'm aware of.

24                    Q.  They've got no incentive to argue
```

```
 1        one way or the other, right?

 2                A.  Not that I'm aware of.

 3                Q.  They were just trying to provide

 4        their best information to their investors or

 5         whoever it is that receives the equity research,

 6        right?

 7                A.  That's fair.

 8                Q.  They are using their best

 9        professional judgment to put out their

10        information, right?

11                A.  You could describe it that way.

12                Q.  All right.  So let's turn to page

13        271, see what they say.  They estimate that

14         Multaq sales have, and I think that funny little

15        symbol is euros, right?

16                A.  It is.

17                Q.  365 million euro in 2015.  415

18        million euros in 2016.  440 million in 2017.

19        465 million in 2018 and 515 million in 2020,

20        right?

21                A.  I see that.  And as I've

22         indicated, they are quite optimistic.  You can

23        see the 26 percent growth in 2015.  We know

24         that's wrong.  Sales declined in 2015 worldwide,
```

```
1           even more controlling for inflation, so this is

2            too optimistic and inconsistent with the other

3           analyst reports that we've evaluated.

4                    Q.  This is one analyst report that

5           suggests that Multaq sales are increasing,

6           right?

7                    A.  Yes, but as I've indicated I

8           disagree with what they projected.

9                    Q.  You can disagree.  I'm not sure

10          you're as unbiased as these equity research

11           people.  But one of the other points I think you

12            made in your direct was one of the reasons you

13           believed that there was a limited, I think that

14          was your word, limited outlook for Multaq was

15           because of the regulatory issues with regard to

16          Pallas; is that right?

17                   A.  Correct.

18                   Q.  So you thought that was going to

19          be a big problem with regard to the sales of

20          Multaq going forward, right?

21                   A.  I would expect it to be, and

22           that's borne out in the data which indicate flat

23          sales since 2011.

24                   Q.  The references you rely on
```

 1    characterize the outlook as not being good,

 2    right, is that fair to say, the ones you rely

 3    on?

 4              A.  They say what they say.

 5              Q.  They didn't provide any numbers.

 6    In your direct testimony, you didn't suggest

 7     that actual sales were projected for Multaq from

 8    those references, did you?

 9              A.  Not the ones we looked at there,

10    but I did consider those in the NPV analysis.

11              Q.  So the references you rely on

12    don't say what the projected sales of Multaq

13    are, that's where we are, right?

14              A.  Well, it depends on what part of

15    the testimony you're asking about.

16              Q.  Well, with regard to Pallas, these

17     people at Cowen, they took Pallas into account,

18    didn't they?

19              A.  Yes, this was after Pallas had

20    been released.

21              Q.  In fact, if you look at the third

22    lineup in the callout, it says despite

23    termination of Pallas, the risk benefit of

24    Multaq remains unchanged.  Do you see that?

```
1              A.  I do.

2              Q.  So these people, who arguably are

3      probably the least biased we've seen, they don't

4      think Pallas has a negative effect, right?

5              A.  I don't know whether they're

6      biased or not, but they are definitely wrong,

7       and you can see that the projections in 2015 are

8      wrong.

9              Q.  Okay.  So they took Pallas into

10      account and they believed that Multaq sales were

11       going to go up to 515 million euros in 2002.  We

12      can agree on that, right?

13              A.  That's what they say.

14              Q.  Okay.  Now, you mention these

15       blocking patent -- the blocking patent and the

16      NCE exclusivity, right?

17              A.  Yes.

18              Q.  And you rely upon your knowledge

19      of patent law and regulatory law for those

20      opinions, right?

21              A.  On my understandings, yes.

22              Q.  Right.  If your knowledge of those

23       laws was wrong, then your opinions would not be

24      very strong, would they?
```

```
1              A.  Depends on which part, I suppose.

2              Q.  Okay.  You don't have a law

3    degree?

4              A.  No.

5              Q.  Never attended law school?

6              A.  No.  I'm an economist.

7              Q.  When you search for case law in

8    your current job, you use Google or Google

9    Scholar, right?

10             A.  I do, yes.

11             Q.  You don't use Westlaw?

12             A.  No, we don't have a subscription

13   to that.

14             Q.  You don't use Lexis, right?

15             A.  No.

16             Q.  And you've obtained your

17   understanding of patent law through your

18     professional experience working as an economist

19     who frequently deals with intellectual property

20   issues like patents, right?

21             A.  Yes.

22             Q.  Lawyers have at times explained

23   the law to you?

24             A.  They have.
```

```
1                Q.  You also obtained your

2    understanding of patent law from your own

3    reading on the subject and discussions with

4    other professionals that are not attorneys,

5    right?

6                A.  Yes.

7                Q.  You also rely upon phone

8     discussions with your counsel in this case for

9    your understanding of patent law, right?

10               A.  In part.  It's one of many

11   factors, yes.

12               Q.  But not the Sandoz or -- not the

13   Defendants that are sitting here right now,

14   right?

15               A.  Not those individuals

16   specifically.

17               Q.  When did you first meet counsel

18   that are at counsel table?

19               A.  It varies by person.

20               Q.  All right.

21               MR. ROTHMAN:  Your Honor, a lot of

22   these questions are legal in nature and we

23    certainly understand that the law is the purview

24    of the Court, but I think as I've demonstrated
```

```
 1      his analysis is based on his understanding of

 2       the law, so I'm going to be asking him questions

 3      that relate to that, not for purposes of

 4      educating the Court on the law, but educating

 5      the Court on what his understanding is of the

 6      law.

 7                      THE COURT:  Why don't you take a

 8       one-minute break and talk to Mr. Solander about

 9       how long you're going to be doing this.  Go talk

10      to Mr. Solander.

11                      MR. ROTHMAN:  Sure.

12      BY MR. ROTHMAN:

13                      Q.  The '510 patent expires in 2016,

14      right?

15                      A.  That's my understanding.

16                      Q.  And the NCE exclusivity expires in

17      2014, right?

18                      A.  Yes.

19                      Q.  And you know that Gilead began

20       developing a competitor Dronedarone product in

21       2010 during the lifetime of the NCE exclusivity

22      and the patent expiration, right?

23                      A.  That's my understanding, it's a

24      combination product.
```

```
 1                    MR. ROTHMAN:  I have nothing

 2       further, Your Honor.

 3                    THE COURT:  Thank you.  Any

 4       redirect.

 5                    MS. CLAYTON:  One quick question,

 6       Your Honor.

 7       BY MS. CLAYTON:

 8            Q.  Doctor McDuff, you were retained

 9       on behalf of both Sandoz and Watson for this

10       case; is that right?

11            A.  I was.  I was retained on behalf

12       of all of the Defendants.

13                    MS. CLAYTON:  Thank you.  No

14       further questions.

15                    THE COURT:  All right.  Doctor

16       McDuff, you may step down.

17                    THE WITNESS:  Thank you.

18                    MR. SOLANDER:  Just a housekeeping

19       matter.

20                    THE COURT:  Okay.  Sure.

21                    MR. SOLANDER:  During the

22       examination, Mr. McArdle and I communicated

23        through a note.  We have agreed to admit JTX-4,

24       which is a certified copy of the '167 file
```

```
 1    history.
 2                   THE COURT:  Okay.  All right.
 3                   MR. McARDLE:  Thank you, Your
 4    Honor.
 5                   THE COURT:  Thank you both.
 6                   MS. RURKA:  And nothing further
 7    from us, Your Honor.
 8                   THE COURT:  All right.  Is there
 9    anything more on your side?
10                   MR. SOLANDER:  No, Your Honor.
11                   THE COURT:  All right.  So we'll
12      recess -- actually -- so in any event, so we're
13    done with the evidence.  We've decided you're
14    coming back at 3 o'clock to do closing
15    arguments, so I'll see you then.  We'll be in
16      recess -- we'll be in recess, but could I just
17      see the various people that were taking things
18      away that I was giving things away at the end of
19    the day yesterday up here for a second?  But
20    everybody else pretend I'm gone.
21                   (Luncheon recess.)
22
23
24
```

```
1    State of Delaware )
                       )
2    New Castle County )

3

4

5              CERTIFICATE OF REPORTER

6

7         I, Stacy Ingram, Registered Reporter,

8    Certified Shorthand Reporter, and Notary Public, do

9    hereby certify that the foregoing record, Pages 808 to

10   939 inclusive, is a true and accurate transcript of my

11   stenographic notes taken on June 9, 2016, in the

12   above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 9th day of June 2016, at

16   Wilmington.

17

18

19              /s/ Dale C. Hawkins

20              Dale C. Hawkins, RMR

21

22

23

24
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24